UNITED STATES of America

v.

Irving H. MEYERS et al. (two cases).

Crim. A. Nos. 71-460, 71-750.

United States District Court, E. D. Pennsylvania.

Feb. 24, 1972.

grant of immunity, they nevertheless must fail since the Federal Government has not met its burden of proving that it made neither direct nor indirect use of defendants' compelled state testimony as a foundation for these indictments.

Robert C. Ozer, Sp. Atty., U. S. Dept. of Justice, Philadelphia, Pa., for plaintiff.

Stanford Shmukler, Philadelphia, Pa., Herbert R. Rich, Philip M. Carden, Nashville, and Paul Antinori, Jr., Tampa, Fla., for defendants.

## MEMORANDUM

HUYETT, District Judge.

This case presents the important question whether the Federal Government may prosecute an individual for crimes relating to a transaction which was the subject matter of his compelled testimony before a state grand jury under grant of full transactional immunity. Defendants Chenoweth, Schott, and Womack, indicted under 18 U.S.C. §§ 1341, 1342, 2, and 371, have moved to dismiss the indictments for two reasons. Initially they contend that their testimony before a state grand jury under grant of transactional immunity bars the Federal Government from pursuing the instant prosecution. Alternatively they suggest that even if the instant indictments are not barred by the state

## I.

On August 18, 1970, defendants Schott and Womack appeared before the Grand Jury of Hillsborough County, Florida, pursuant to subpoenas issued by the Circuit Court of Hillsborough County. When asked to testify concerning transactions between Hillsborough County and Shoup Voting Machine Corporation (Shoup) involving the purchase and sale of new and used voting machines, defendants invoked their privilege against self-incrimination. The State Attorney in charge of the investigation then advised defendants that they were granted immunity from prosecution under Florida Statute[1] and, therefore, compelled to testify. Defendants, thereafter, did so testify.

On December 4, 1970, defendant Chenoweth appeared in the office of his attorney in Nashville, Tennessee, pursuant to a request of the Florida State Attorney. This appearance was in lieu of an appearance before the Hillsborough County Grand Jury. At that time the State Attorney executed and delivered to Chenoweth a "Document of Immunity" purporting to grant him full and complete immunity under Florida Law in re-

---

1. Florida Statute § 932.29, F.S.A. Amended by Laws 1969, c. 69–316, § 1, eff. Oct. 1, 1969:

   "No person shall be excused from attending and testifying, or producing any book, paper or other document before any court upon any investigation, proceeding or trial, for a violation of any of the criminal statutes of this state upon the ground or for the reason that the testimony or evidence, documentary or otherwise, required of him may tend to convict him of a crime or to subject him to a penalty or forfeiture, but no person shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter or thing concerning which he may so testify or

   produce evidence, documentary or otherwise, and no testimony so given or produced shall be received against him upon any criminal investigation or proceeding. This section shall not apply to any person giving any testimony or producing any book, paper or other document unless such person does so upon the demand of the prosecuting attorney having jurisdiction to prosecute for the violation of the criminal statute involved upon the investigation, proceeding or trial at which the testimony is given or the documentary evidence produced."

   This section has since been renumbered § 914.04 and amended by Laws 1970, c. 70–339, § 97, eff. Jan. 1, 1971.

turn for his compelled testimony concerning voting machine transactions. Thereafter, Chenoweth answered questions in deposition format and a transcript of the proceedings was made.

The Report of the Hillsborough County Grand Jury, Spring Term-1970, (Exhibit D–4) was filed on August 26, 1970 in the Minute Books in the Office of the Clerk of the Court of Hillsborough County. The report concluded that the voting machine transactions under investigation resulted in tremendous financial loss to Hillsborough County but that lack of specific evidence prevented a finding as to those persons directly responsible.[2] The report did not specifically mention Schott and Womack by name, but summarized testimony of the "Executive Vice President of Shoup" and the "President of Southern Municipal Sales, Inc." which is the "Florida Sales Representative of Shoup". Although the Tampa, Florida newspapers covered the Hillsborough County Grand Jury Investigation and the final report extensively, a transcript of the testimony was never made public.

At the evidentiary hearing held in connection with the instant motions on January 3 and 4, 1972, the Federal Government undertook to satisfy the Court that neither direct nor indirect usage was made of defendants' Hillsborough County Grand Jury testimony. To satisfy this burden the Government endeavored to trace the history of the federal investigation of Shoup to demonstrate that it used completely independent sources of evidence in obtaining these indictments.

Testimony elicited from Government witnesses at the hearing indicates that the federal investigation of Shoup evolved from a routine audit of Philadelphia labor unions by the Department of Labor under the auspices of the Department of Justice Strike Force sometime in 1970. One labor union was found to have made a loan initially of $300,000 and later raised to $400,000 to a certain woman. In the course of its investigation the Department of Labor found that this woman was periodically receiving large sums of money from Shoup, depositing them into a bank account, and simultaneously withdrawing approximately half to two-thirds of the money in cash. Since this circumstance suggested to the Strike Force the possibility of interstate bribery in connection with Shoup municipal sales, further investigation of Shoup was undertaken.

Thereafter, in January, 1971 a large volume of Shoup books and records was subpoenaed by the federal grand jury. These records included cancelled checks and records of contracts for commission work around the country. Special agents of the Strike Force assigned to work with the grand jury then constructed a list of between 150 and 200 payees of large amounts of money that did not seem satisfactorily explained. In April and May, 1971, personnel were dispatched around the country to interview the various payees concerning the circumstances of the payments.

John Conway, investigator for the Immigration Service, and Christopher Kelly, Compliance Officer for the Department of Labor, were the Philadelphia Strike Force personnel primarily responsible for the Florida portion of the investigation. On or about April 27, 1971, Kelly and Conway commenced their Florida investigation in Jacksonville. Their list of large payees compiled from the subpoenaed Shoup records included defendants Womack and Southern Municipal Sales, Inc. (Southern Municipal). On April 28 and 29 a check of state records revealed that Southern Municipal was a Florida corporation with a Daytona Beach address and defendant Womack was its president. When contacted by telephone, Womack advised that he desired to cooperate but that he

2. It is most interesting that no criminal indictments were returned by the Hillsborough County Grand Jury, but, among various recommendations, it was suggested that the County Attorney for Hillsborough County explore the possibility of civil litigation to recover damages for the County.

wanted to have his attorney present. Since his attorney lived in Georgia and Kelly and Conway had limited time, an interview could not be arranged.

Kelly and Conway next spent several days investigating in the Miami area. Their reports, however, prepared shortly after the trip, do not indicate that anything was uncovered in Miami that would be relevant to defendants' instant motions.

Thereafter, Kelly and Conway were in Tampa, Hillsborough County, Florida from approximately May 3 to May 12, 1971. They admitted spending several hours reading articles about the Hillsborough County probe of Shoup in the clip files of the Tampa Tribune and Tampa Times.

The Tampa press apparently covered the Hillsborough County Shoup investigation rather extensively. Consequently, the newspaper articles discussing the defendants which may have come to the attention of Kelly and Conway have been scrutinized. That portion of the Report of the Hillsborough County Grand Jury quoted from and paraphrased in newspaper articles reads as follows:

"The Grand Jury heard testimony that the voting machine foreman recommended the replacement of the used machines in question for the reason that they were obsolete, and in the near future would become irreparable, and could no longer be used by the County in public elections. This recommendation was acted upon by the Board of Elections and by the Board of County Commissioners in arranging for the purchase of new machines and the sale of used machines. The used machines were sold to Southern Municipal Sales, Inc., for $30.00 per machine, with the costly interlock devices left intact on the machines. It appears from the evidence that this fact was unknown to either the Board of Elections or the Board of County Commissioners.

"The Grand Jury finds that further inquiry by those agencies would have revealed said fact, most certainly resulting in a savings of $118,710.00 on the purchase of new interlocks for the new machines.

"A representative of Southern Municipal Sales, Inc., testified that he had expected the machines to be stripped of interlock devices prior to their delivery to him. This belief was also shared by representatives of Shoup who had earlier unsuccessfully bid on the same machines. Nevertheless, the Southern Municipal official testified that upon delivery he found the interlocks intact but did not notify the County of this fact.

"The primary officer of Southern Municipal Sales, Inc., is engaged in another capacity as the Florida Sales Representative for the Shoup Voting Machine Corporation. Southern Municipal sold 100 of the used Hillsborough County machines to the Shoup Corporation for $500.00 per machine. These 100 machines were ultimately sold by Shoup to Harris County, Texas, at a price of $1,500.00 per machine, after several minor modifications were made . . ."

Exhibits D–3 and D–9, newspaper articles from The Tampa Tribune, refer to this language and attribute the testimony therein to defendant Womack.

Exhibit D–23, an article from The Tampa Tribune, appears to be the only news article that refers to testimony of defendant Schott. D–23 indicates only that Schott testified before the Hillsborough County Grand Jury but that "[w]hat was said by Shoup Voting Machine Co. vice president Martin Schott and Florida sales representative John C. Womack remained a secret behind closed doors of the grand jury room in the Courthouse."

Similarly, the articles which mention testimony by Chenoweth indicate only that he testified under grant of immunity but do not mention the substance of his testimony. See Exhibits D–3, D–23, and D–24. Chenoweth is also referred to in Exhibit D–23 through the testimo-

ny of another witness before the Hillsborough County Grand Jury:

"H. N. McElroy, another witness, is supervisor of elections in Harris County, Houston, Tex. He has told newsmen he met here last Dec. 11 with Chenoweth and Womack at the county voting machine warehouse where he viewed the 180 'old' machines and tested many of them.

"McElroy, who said he found the machines in 'excellent' condition, later recommended his county buy them for $1,500 each. Harris County did buy the machines.

"McElroy said also the $1,500 price offer was made to him by Chenoweth at the warehouse with Womack present."

That the federal investigators saw the reference to McElroy's testimony is apparent from Exhibit D–6, an inter-governmental memorandum from John Conway to the attorney in charge of the Philadelphia Strike Force.

## II.

▮▮▮ Thus, it must be determined what immunity is sufficient to supplant the Fifth Amendment's privilege against self-incrimination where the questioning sovereign is a State and the prosecuting sovereign is the Federal Government.

In both Counselman v. Hitchcock, 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110 (1892) and Brown v. Walker, 161 U.S. 591, 16 S.Ct. 644, 40 L.Ed. 819 (1896), the Supreme Court held that in view of the constitutional privilege against self-incrimination, a state immunity statute, to be valid, must afford absolute immunity against future prosecution for the offense to which the question relates. In *Counselman* the Court struck down a statute for failure to grant comprehensive enough immunity in return for compelled testimony. Four years later in *Brown* the Court upheld a new statute that required testimony under protection of full transactional immunity from prosecution in response to the guidelines set forth in *Counselman*.

Not until Murphy v. Waterfront Commission, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964), however, did the Supreme Court discuss the precise problem presented by the instant motions, i. e. the effect of a *state* grant of full transactional immunity upon the right of the *federal* authorities to prosecute for crimes relating to the transaction about which the state had compelled testimony. *Murphy* involved a witness who refused to testify in a New Jersey state inquiry despite a grant of full transactional immunity. He contended that he was not adequately safeguarded and could not be required to testify because the New Jersey immunity statute could not protect him from prosecution or from incriminating use of his testimony by federal authorities. The Supreme Court held at 378 U.S. 52, 79, 84 S.Ct. 1594, 1609, 12 L.Ed.2d 678:

". . . a state witness may not be compelled to give testimony which may be incriminating under federal law unless the compelled testimony and its fruits cannot be used in any manner by federal officials in connection with a criminal prosecution against him. We conclude, moreover, that in order to implement this constitutional rule and accommodate the interests of the State and Federal Governments in investigating and prosecuting crime, the Federal Government must be prohibited from making any such use of compelled testimony and its fruits."

Moreover, the Court added:

"Once a defendant demonstrates that he has testified, under a state grant of immunity, to matters related to the federal prosecution, the federal authorities have the burden of showing that their evidence is not tainted by establishing that they had an independent, legitimate source for the disputed evidence."

The Third Circuit recently had occasion to interpret the scope of *Murphy* in United States ex rel. Catena v. Elias, 449 F.2d 40 (3. Cir. 1971). The Court

there was confronted with the argument that because *Murphy* established that a second sovereign must accord a person no more than use immunity for the testimony originally compelled by another sovereign, no more is required of the immunity granting sovereign than it confer use immunity in the first place. In rejecting this argument the Court noted that serious considerations of federalism arise when and to the extent that immunity granted a witness by one state impinges upon the independent power of another state to prosecute him. 449 F.2d at 44. The Court went on to state (p. 44):

> "For no state other than the grantor of immunity has had an opportunity to elect whether it will forego prosecuting the witness as a price worth paying for his testimony. And states may well differ in judgment as to the importance and desirability of prosecuting a particular participant in wrongdoing. Thus, to deprive a state of the right to prosecute a violation of its criminal law on the basis of another state's grant of immunity would be gravely in derogation of its sovereignty and obstructive of its administration of justice." [3]

The Court concluded, therefore, that:

> "Analytically, the *Murphy* decision is a reaffirmation of the adequacy of transactional immunity as recognized by *Counselman* and *Brown,* coupled with a supplementary ruling that another sovereign must respect so much,

but only so much, of that grant as prohibits the use of the testimony or its fruits in a prosecution under its law." 449 F.2d at 44.

Most recently, the Eighth Circuit interpreted *Murphy* similarly in United States v. McDaniel, 449 F.2d 832, at p. 836 (8 Cir. 1971):

> "We agree with the Government that the *Murphy* rule is controlling in the instant situation and we do not think this presents any necessary conflict with the *Counselman* case. *Counselman* was concerned with the situation where the questioning sovereign is also the prosecuting sovereign. In such a situation, the constitutional problems posed by the Fifth Amendment are not complicated by considerations of federalism. Where the questioning sovereign is a State, however, and the prosecuting sovereign is the Federal Government, problems of federalism—which also of course are constitutional in nature—affect the Fifth Amendment question. And it is precisely this situation that *Murphy* controls, preventing the use of the compelled testimony by the Federal Government, but not preventing prosecution provided that the Federal Government has an independent source for its evidence."

In view of such uniform and persuasive authority, defendants' suggestion that the existence of their compelled state testimony in itself bars the instant federal prosecution must be rejected.[4]

---

3. Also, of course, there is always the possibility of chicanery which might cause state officials to grant full transactional immunity to a witness faced with the prospect of prosecution in another jurisdiction, state or federal. Such state granted immunity may seriously handicap, if not foreclose, prosecution in the other jurisdiction. Further, in a case involving multijurisdictional transactions federal prosecution may be considerably more effective.

4. It is recognized that as this memorandum is being written, the United States Supreme Court has under consideration three cases which present the question whether

a state immunity statute is valid which merely prevents subsequent use of a witness's testimony and evidence derived therefrom and not full transactional immunity. See Zicarelli v. New Jersey Comm. of Investigation, No. 69–4; Sarno v. Illinois Crime Investigating Comm., No. 70–7; Kastigar v. United States, No. 70–117. The Supreme Court heard argument on these cases last month. See 40 U.S.L.W. 3325 (January 18, 1972). Although these cases do not present the precise factual situation of state compelled testimony followed by federal prosecution, the Court, of course, may address itself to that question.

These same authorities clearly indicate, however, that the Federal Government has the burden of showing that it has made no use of the compelled testimony and its fruits but rather has an independent source for its evidence.

With respect to defendants Chenoweth, Schott, and Womack, the Federal Government has adequately demonstrated that it has used independent sources of evidence in obtaining these indictments. Without reviewing the entire history of the federal investigation of Shoup, it seems apparent that the instant indictments resulted from a Department of Labor audit, books and records of Shoup subpoenaed by the Federal Government, interviews conducted by federal agents in the course of their investigation, and testimony before the federal grand jury sitting in Philadelphia.

It is also apparent that the Federal Government has made no use of the compelled testimony before the Hillsborough County Grand Jury. A transcript of the Hillsborough County Grand Jury testimony was never made public and there is no indication that federal authorities ever saw such a transcript. In fact, when agents Kelly and Conway became aware of the Florida investigation and so informed the Justice Department attorney in charge of the Shoup investigation, they were directed to avoid all contact with the local investigation. Kelly and Conway followed this direction as did the attorney in charge in Philadelphia.

Consequently, the instant case is strikingly different from *McDaniel*. There the United States Attorney admitted requesting and receiving a copy of the transcript of McDaniel's compelled state testimony. The Court, therefore, concluded at p. 840:

> "If the Federal Government is allowed to prosecute despite the fact that it has seen the compelled testimony, there is clearly no deterrent to its seeking access to that testimony. Therefore, if, as argued above, *Murphy* is intended to forbid such access,

the only effective sanction for this evasion of the *Murphy* rule is to forbid prosecution.

> "For the foregoing reasons, we conclude that if in fact McDaniel testified before the state grand jury as to matters related to the instant prosecution, then since the Government has seen that testimony, the indictments should be dismissed. To avoid possible misunderstanding, we think it appropriate to emphasize that the failure of the Federal prosecution here arises not because McDaniel was granted immunity under state law, but because the Federal Government took advantage of this immunity to gain access to his testimony."

The only contact the Federal Government had with the local Florida investigation in this case was through newspaper articles that Kelly and Conway may have read while in Tampa.

With regard to defendant Womack, these articles paraphrased only a small portion of his grand jury testimony as reported in The Report of the Hillsborough County Grand Jury. If the Federal Government had no independent source of evidence to justify the indictment of Womack, this newspaper exposure might be troublesome. Womack, however, was a subject of the federal investigation before the federal investigators ever read about him in Tampa. He was, for example, one of the large payees of Shoup checks whose name had come to light as a result of the Federal Government's subpoena of Shoup books and records. Furthermore, Kelly and Conway had investigated and attempted to interview him in Jacksonville two weeks before they arrived in Tampa. Thus, there does not appear here the type of "use" of state compelled testimony forbidden to the Federal Government the indictments as to defendants Schott in *Murphy* and *McDaniel*.

There is even less reason to dismiss and Chenoweth. The Federal Government's attention was directed to Schott and Chenoweth through the Shoup books and records which revealed their in-

volvement in Shoup transactions. Furthermore, the newspaper articles which mention their names make no reference to the content of their state testimony but merely note that they did testify under state grant of immunity. This situation, too, falls far short of what one envisions as the "misconduct and collusion" referred to, for example, in Mr. Justice White's concurring opinion in *Murphy.* 378 U.S. at 102, 84 S.Ct. at 1615, 12 L.Ed.2d 678.

Finally, the fact that federal investigators may have been led to further investigation of defendant Chenoweth because of a Tampa newspaper article reporting the Hillsborough County Grand Jury testimony of H. N. McElroy is no reason to dismiss the instant indictments as to Chenoweth. Certainly the immunity from use by the Federal Government of Chenoweth's state compelled testimony does not protect him from use of testimony of another witness. The Federal Government, therefore, had every right to make use of the newspaper reference to McElroy's testimony.

For the reasons expressed herein, defendants' motions to dismiss the indictments were denied by Order dated February 4, 1972.