**UNITED STATES of America,**
**Appellant,**

v.

**Felipe DE DIEGO.**

**No. 74–1769.**

United States Court of Appeals,
District of Columbia Circuit.

April 16, 1975.

---

820

Henry S. Ruth, Jr., Sp. Prosecutor, Watergate Special Prosecution Force, Peter M. Kreindler, Counsel to the Sp. Prosecutor, and Kenneth S. Geller, Asst. Sp. Prosecutor, were on the brief for appellant.

William Bradford Reynolds, Washington, D. C., filed a brief as amicus curiae appointed by this court.

Before RIVES,* Senior Circuit Judge, and WRIGHT and McGOWAN, Circuit Judges.

Opinion for the court filed by Senior Circuit Judge RIVES.

Dissenting opinion filed by Circuit Judge McGOWAN.

RIVES, Senior Circuit Judge:

On March 7, 1974, a grand jury presented an indictment to the United States District Court for the District of Columbia which charged Felipe De Diego, five co-defendants, and three persons named as co-conspirators but not as defendants with the crime of conspiracy in violation of 18 U.S.C. § 241 (1970).[1] As part of the conspiracy the indictment charged that the conspirators, without

---

* Of the Fifth Circuit, sitting by designation pursuant to 28 U.S.C. § 294(d) (1970).

1. If two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same * * *

 * * * * * *

They shall be fined not more than $10,-000 or imprisoned not more than ten years, or both * * *.

lawful authority, would covertly and unlawfully enter the offices of Dr. Lewis J. Fielding, a psychiatrist located in Beverly Hills, California, with intent to search for confidential information concerning Daniel Ellsberg, one of Dr. Fielding's patients.

De Diego moved to dismiss the indictment on the ground, *inter alia,* that under grants of immunity from the States of Florida and California he had, on May 10, 1973, provided testimony which discussed his involvement in said conspiracy, which testimony admittedly came into the hands of the Government.

■ In a pretrial hearing based on an offer of proof, the District Court, on May 22, 1974, granted De Diego's motion and dismissed the indictment as to De Diego with prejudice.[2] On June 18, 1974 the United States appealed from the order dismissing the indictment as to De Diego.[3] We reverse and remand for further proceedings not inconsistent with this opinion.

After the pretrial hearing, in dismissing the indictment as to De Diego, the trial judge stated:

> * * * Although the prosecutors had independent evidence of Mr. De Diego's admitted involvement in this matter, and have proceeded at all times in good faith, there is no practical way at this stage of the proceeding to establish whether or not a taint has occurred without hearings which would last over several days. There is not time to accomplish this before tri-

al; and a preliminary review of the Prosecutor's proof and investigatory methods would at best generate additional pretrial publicity of a particularly unfortunate kind.

> \* \* \* \* \* \*

> Severance, the only remaining alternative, walks squarely into the speedy trial obstacle.

> * * * The prospects that taint can be removed by hearing are also, in the Court's opinion, dim. The immunized testimony was detailed and taken at an early stage of the investigation.

■ It is important to note that the District Court's order of dismissal (quoted at note 2 *supra*) is based on the ground "that the Special Prosecutor has not met his burden of establishing that such immunity has not or will not taint the case." Consideration of this appeal may be clarified by recognizing as precisely as we can the extent of the burden resting on the United States. We agree with the District Court's holding that

> [o]nce immunity is shown, the prosecutor has the burden of demonstrating that its use of the immunized testimony has not tainted any aspect of the case up to indictment and will not do so during trial.

De Diego is entitled to the full protection of his Fifth Amendment privilege against self-incrimination. That privilege is now fully applicable to the States

---

**2.** The District Court's order reads:

> Defendant deDiego having moved to dismiss the indictment as to him on the ground that he was granted immunity by the State of Florida, and it appearing, after oral argument, that the Special Prosecutor has not met his burden of establishing that such immunity has not or will not taint the case, now therefore, for reasons more fully stated by the Court in the transcript of May 21, 1974, it is
>
> ORDERED that the motion is granted and the indictment is dismissed as to deDiego with prejudice.
>
> /s/ Gerhard A. Gesell
> GERHARD A. GESELL.
> United States District Judge.

May 22, 1974.

The reasons which impelled the District Court to dismiss the indictment as to De Diego were stated orally by Judge Gesell on the day preceding the order. That part of the transcript is quoted in an appendix to this opinion.

**3.** 18 U.S.C. § 3731, as amended Jan. 2, 1971, permits the United States to appeal within 30 days from a judgment or order of a District Court dismissing an indictment as to any one or more counts except where the double jeopardy clause prohibits further prosecution. This appeal is authorized, and this court has jurisdiction. 9 J. Moore, Federal Practice ¶ 110.04 and its supplement.

as well as to the United States, whether the testimony is compelled under a grant of immunity by one or more of the States or by the Federal Government. In any event such a grant of immunity is valid only if it is coextensive with the scope of the privilege against self-incrimination. Murphy v. Waterfront Commission of New York Harbor, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964).

█ On the other hand, such a grant of immunity cannot afford broader protection than the Fifth Amendment privilege without infringing upon both the great common law principle that "the public has a right to every man's evidence," and the duty to testify "recognized in the Sixth Amendment requirements that an accused be confronted with the witnesses against him, and have compulsory process for obtaining witnesses in his favor." Kastigar v. United States, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). A grant of immunity broader than the Fifth Amendment privilege against self-incrimination might also infringe upon the right of another sovereignty, whether the Federal Government or another State, to enforce its laws.

No balancing is required because the several rights, privileges, and duties, while co-terminal, are not conflicting. Each is accommodated by placing the accused in the same position as if he had claimed his privilege and refused to testify in the absence of a grant of immunity. *Kastigar, supra,* 406 U.S. at 441, 92 S.Ct. 1653.

██ As against De Diego the United States bears the "heavy burden" (*id.* at 461, 92 S.Ct. 1653) of proving that all of the evidence used or to be used was derived from legitimate independent sources. Further, "the compelled testimony can in no way lead to the infliction of criminal penalties" on the witness. *Id.* The prosecution must show that it did not and will not use against De Diego his immunized testimony or its fruits "in *any* respect." *Id.* at 453, 92 S.Ct. 1653 (emphasis by the Court). In the taint hearing the trial judge does not weigh the evidence he finds untainted. His function is exhausted when he separates the tainted from the untainted. The decision as to continuing the prosecution is the prosecutor's.

██ The very fact that the burden on the United States is "heavy" emphasizes the necessity of granting an evidentiary hearing to determine taint, as required by Murphy v. Waterfront Commission, *supra,* 378 U.S. at 79, 84 S.Ct. 1594, and *Kastigar, supra,* 406 U.S. at 461–462, 92 S.Ct. 1653. Admittedly no evidentiary hearing was afforded the Government in this case. The trial court dismissed the indictment "after oral argument" based on an offer of proof. District Court Order, *supra,* note 2. The prosecution made it clear, however, that if the judge was not prepared to begin the trial of the case on the basis of the offer of proof, an evidentiary hearing would be required. The trial court was of the view that "[a]lthough the prosecutors had independent evidence of Mr. De Diego's admitted involvement in this matter," there was no way "to establish whether or not a taint has occurred without hearings * * *." That being so, it had no discretion to dismiss the case without giving the Government an opportunity to prove lack of taint.[4]

The Government investigation in this case was begun before appellee was

---

4. [I]n every reported decision in which a federal prosecution has been attacked on the ground of state-granted immunity [a taint hearing has been accorded]. See, *e. g.,* United States v. First Western State Bank, *supra,* 491 F.2d 780 at 784; United States v. Dornau, 491 F.2d 473, 476 (2d Cir. 1974), cert. denied 419 U.S. 872, 95 S.Ct. 132, 42 L.Ed.2d 111 (1974) (No. 73–1390); United States v. Catalano, *supra,* 491 F.2d 268 at 272; United States v. McDaniel, 482 F.2d 305, 306 (8th Cir. 1973); United States v. Seiffert, *supra,* 357 F.Supp. 801 at 809–10; United States v. Meyers, *supra,* 339 F.Supp. 1154 at 1156. The failure to hold any evidentiary hearing in this case before dismissing the indictment was clear error." Brief for appellant at 27 (footnote omitted).

granted immunity after giving his statement to the Florida authorities on May 10, 1973. The record, even without an evidentiary hearing, fully confirms the trial court's judgment that "the prosecutors had independent evidence of Mr. De Diego's admitted involvement" at that time. The record further shows that this evidence was not insignificant. The record reveals that prior to May 10, 1973 the United States was in possession of substantial evidence implicating De Diego in the break-in of Dr. Fielding's office, including extensive testimony to a grand jury in the District of Columbia given by E. Howard Hunt on May 2, 1973. Hunt's testimony would directly implicate De Diego in the alleged conspiracy, even though Hunt did not specifically identify De Diego by name as one of the two men who actually broke into Dr. Fielding's office. Hunt did testify that De Diego was one of "the three men from Miami" he had met there when they were being recruited by Barker, another conspirator, to participate in the Fielding break-in. JA 21A. He testified further:

> We were united with the three men from Miami, and I believe—that evening we familiarized them with the area under the nighttime operating conditions.
>
> We rented cars, if I'm not mistaken, either that day or the following day. Each man was instructed in his duties for that target of the operation that night.

JA 22A.

> We wanted a pretexted entry, a fact that was obtained by equipping two of the men from Miami with delivery men's clothing and a large green suitcase which actually carried the camera equipment inside it.

JA 23A.

5. 17. On or about September 1, 1971, G. GORDON LIDDY and E. Howard Hunt, Jr. travelled from Washington, D. C. via Chicago, Illinois to Los Angeles, California for the purpose of meeting with BERNARD L. BARKER, FELIPE DE DIEGO and EUGENIO R. MARTINEZ.
JA 8A–9A.

* * * [W]e only had two sets of disguises, and they were used by two of the men, by the two men who made the pretexted entry earlier that evening.

Q. Who were they?

A. It would have to be two of the three. I am honestly not sure. I don't know, sir. It is just removed. JA 25A. Among the overt acts charged in the indictment, Hunt's testimony would connect De Diego with No. 17.[5] As to overt act No. 18,[6] Hunt's testimony would indicate that two of the three actually searched the office and the third was a party to the conspiracy to search.

In addition to this pre-May 10, 1973 evidence, the prosecution argues that "any conceivable taint which the federal government's access to [De Diego's immunity statement] might have produced was completely dissipated on June 18, 1973 when, on his own initiative and under no inducement whatsoever by the government, De Diego arrived at the office of Principal Assistant United States Attorney Earl J. Silbert and, in the presence of Silbert, Assistant United States Attorneys Seymour Glanzer and Donald Campbell, and Special Assistant to the Special Prosecutor James F. Neal, admitted his participation in the Fielding break-in." Brief for appellant at 20. Thus the Government maintains that, wholly apart from the untainted evidence which it had accumulated prior to May 10, 1973, these admissions by appellee on June 18 establish another "independent, legitimate source for the disputed evidence." Murphy v. Waterfront Commission, *supra*, 378 U.S. at 79 n. 18, 84 S.Ct. at 1609.

 A trial court faced with a pretrial motion to dismiss the indictment because of immunity granted by Federal

6. 18. On or about September 3, 1971, BERNARD L. BARKER, FELIPE DE DIEGO and EUGENIO R. MARTINEZ searched the offices of Dr. Lewis J. Fielding located in Beverly Hills, California for the purpose of obtaining confidential information concerning Daniel Ellsberg.
JA 9A.

or State Governments has basically four alternative procedures for determining whether or not the prosecution's evidence is tainted: (1) it can hold a pretrial evidentiary hearing; (2) it can hold a taint hearing during the trial as the questioned evidence is offered; (3) it can hold a post-trial hearing to determine taint; or (4) it can use a combination of these alternatives. In exercising its options where, as here, there are other defendants named in the indictment, the trial judge may order a severance so that the question of taint can be limited to the trial of the defendant claiming immunity.

 The first reason given by the trial court for denying an evidentiary hearing on taint and dismissing the indictment was that it would be impractical "to establish whether or not a taint has occurred without hearings which would last over several days. There is not time to accomplish this before trial." The fact is that the trial was not scheduled to begin for four weeks, and it did not start until five weeks later. Moreover, a preliminary evidentiary pretrial hearing on taint lasting considerably less than several days could easily have been undertaken during that time.

The trial judge also stated that a pretrial hearing "would at best generate additional pretrial publicity of a particularly unfortunate kind." But the hearing could have been held *in camera* to remove the threat of pretrial publicity. Indeed, such a pretrial taint hearing was held *in camera* by the District Court here in United States v. Mitchell et al., D.D.C. Criminal No. 74–110, apparently without generating additional pretrial publicity.

 A further option open to the trial court here was, of course, severance.

De Diego himself had previously moved for severance. But even in the absence of such a request by either party, the court had the power, in the interest of justice, to grant a Rule 14 severance *sua sponte*. See Jackson v. United States, 134 U.S.App.D.C. 18, 20, 412 F.2d 149, 151 (1969). A continuance in this case would not have walked "squarely into the speedy trial obstacle." Appellee's indictment had been returned on March 7, 1974, and the indictment was dismissed as to him on May 21, 1974. The trial of the other defendants was concluded on July 12, 1974. If appellee's trial had begun a reasonable time thereafter, no serious speedy trial obstacle would have been presented.[7] Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972); United States v. Rucker, 150 U.S.App.D.C. 314, 316, 464 F.2d 823, 825 (1972).

 A trial judge has no discretion to end prosecutions unless there are legal grounds for the exercise of discretion.[8] See United States v. Weinstein, 452 F.2d 704, 714–715 (2nd Cir. 1971); United States v. Dooling, 406 F.2d 192, 196–197 (2nd Cir.), cert. denied, 395 U.S. 911, 89 S.Ct. 1744, 23 L.Ed.2d 224 (1969). Cf. Rule 48, Fed.R.Crim.P. Discretion to prosecute remains with the prosecutor. Confiscation Cases, 74 U.S. (7 Wall.) 454, 19 L.Ed. 196 (1869). Even if the trial court eventually held, after appropriate hearing, that all evidence obtained by the Government after May 10, 1973 was tainted, the prosecutor could easily have chosen to go to trial with De Diego on the pre-May 10 evidence alone. Absent a showing of bad faith, and the District Court here specifically found that the prosecutors not only "had independent evidence of Mr. De Diego's admitted involvement in this matter" but also that

---

7. Disposition of this appeal has been delayed by the failure of appellee, in spite of repeated requests, to participate in this appeal. This court was finally required to appoint an *amicus* to respond to appellant's brief.

8. While in the absence of express statutory grounds for dismissal a trial court may *still* have legal discretion to dismiss an indictment

"to do justice," United States v. Dooling, 406 F.2d 192, 196 (2nd Cir.), cert. denied, 395 U.S. 911, 89 S.Ct. 1744, 23 L.Ed.2d 224 (1969); United States v. Apex Distributing Co., 270 F.2d 747, 756 (9th Cir. 1959), the scope of this power is not raised here since we find the asserted reasons for dismissal to be inadequate. See Ex Parte United States, 306 F.2d 737, 738 (9th Cir. 1962).

the prosecutors "have proceeded at all times in good faith," neither this court nor the trial court in this case has any authority to review prosecution discretion. We do note, however, that the Special Prosecutor here has recently undertaken to dismiss a case[9] apparently similar in some respects to the one before us. On remand, after the legal issues raised by this appeal are resolved, we have no reason to believe he will not review this case in the light of his action in *Strachan*, if such a review is indicated.

Reversed and remanded.

### APPENDIX

Portion of Proceedings of May 21, 1974

The other matter before the Court involves the question of Mr. De Diego's immunity. He seeks dismissal because of immunity he received under state law.

I think this claim has merit and the motion should be granted. The state action carries use immunity for this Federal prosecution, as Kastigar teaches. That state immunity was granted isn't disputed. Once immunity is shown, the prosecutor has the burden of demonstrating that its use of the immunized testimony has not tainted any aspect of the case up to indictment and will not do so during trial.

The FBI and at least one member of the Special Prosecutor's staff admittedly read the immunized testimony. Although the prosecutors had independent evidence of Mr. De Diego's admitted involvement in this matter, and have proceeded at all times in good faith, there is no practical way at this stage of the proceeding to establish whether or not a taint has occurred without hearings which would last over several days. There is not time to accomplish this before trial; and a preliminary review of the Prosecutor's proof and investigatory methods would at best generate additional pretrial publicity of a particularly unfortunate kind.

Post-trial determination would not obviate numerous objections which will be made during the trial and also post-trial determination would, in the Court's view, be most unfair. Mr. De Diego is a non-resident of limited means and should not be forced to the expense and inconvenience of trial if he has in fact been immunized.

Thus the essential dilemma presented by use immunity, particularly in a somewhat complex conspiracy case, is brought into sharp focus. It is unfair to delay post-trial. It is difficult, if not impossible, to attempt to fully resolve the issue pretrial, not only because of the time factors which the Court has mentioned, but the uncertainty as to what evidence the Government may be obliged to offer or will offer during the trial, particularly under the pressures of cross-examination.

Severance, the only remaining alternative, walks squarely into the speedy trial obstacle.

Under these circumstances, the Court has limited flexibility. It must proceed on the papers before it, assisted by the colloquy at oral argument. Normally, a prosecutor can protect himself by recording his information about a defendant contemporaneously before immunity is granted in some official form. This opportunity was not available because the state acted, apparently, on its own. The prospects that taint can be removed by hearing are also, in the Court's opinion, dim. The immunized testimony was detailed and taken at an early stage of the investigation.

In addition, Mr. De Diego gave other statements under immunity, granted later by the State of California, and even later than that by the prosecution.

The paramount rights of the Defendant against self-incrimination, accordingly, will be recognized and the indictment is, accordingly, dismissed as to Mr. De Diego.

---

9. United States v. Gordon Strachan, D.D.C. Criminal No. 74–110.

McGOWAN, Circuit Judge (dissenting):

With all respect, I would, on what is shown by this record, accord the trial judge a greater latitude than has the majority to manage the important criminal proceedings before him with due regard for both fairness and dispatch. He was handed a sticky problem by reason of the Special Prosecutor's apparent receptivity to examination of all the information available from immunity grants, without reflection on whether he needed it to make a case.

When the question arose on the eve of a major trial as to what to do about this problem, the Special Prosecutor was less than helpful: He expressed himself as opposed to severance; agreed that it would be undesirable to defer the taint hearing until after trial and disclaimed any purpose to urge that alternative; both urged and discounted the problems involved in holding such a hearing before trial; and concluded by offering only the suggestion that, if the hearing could not be held so close to trial, then the trial should be postponed. In the more relaxed atmosphere of an appeal, and with all the zeal of a recent convert, the Special Prosecutor now insists that the trial court should be reversed because it failed to sever or to hold an *in camera* hearing before trial.

I regard these circumstances of record as highly relevant to the question of whether the court erred in resolving the problem it confronted the way it did. They do not appear in the transcript appended to the majority opinion. But that transcript is solely the court's oral ruling made the day after the close of the preliminary hearing which the court held for the purpose of informing itself about the nature and extent of the taint problem, and of pursuing with counsel the question of how best to proceed. The transcript of that hearing, not quoted by the majority, is both revealing and relevant. It indicates why the court estimated the Special Prosecutor's chances of meeting its burden to prove absence of taint as "dim," and why it decided that, under all the circumstances, including the views expressed by the Special Prosecutor, the indictment should be dismissed.

Before formulating his opinion that "[t]he prospects that taint can be removed by hearing are . . . dim," (Tr. 190), the district judge considered four affidavits and heard oral argument. The admitted facts strongly support his conclusion.

The federal investigation into the "Fielding break-in" began pursuant to the April 27, 1973 directive of Judge Byrne of the Central District of California. On May 2, 1973, a federal grand jury in Washington, D. C. heard testimony from E. Howard Hunt on the subject of the break-in. In that testimony, De Diego was mentioned only twice, once when Hunt stated that De Diego was "run by me" in Miami (with no indication of the result of that fact), and once in the following question and answer (long after the other mention of De Diego):

[Prosecutor]: All right. What funds were provided [by Krogh via Liddy] to the three men from Miami; that is Mr. Barker, Mr. De Diego, and Mr. Martinez?

[Hunt]: Certainly their plane fares, and a moderate amount of money to reimburse them for time lost in the real estate business.

Tr. of Grand Jury, May 2, 1973, at 24. Hunt's response thus was directed toward the question of the amount given, and not toward the proposed identity of the men.

On May 8, the FBI attempted to interview De Diego on the subject of the break-in, but De Diego refused to testify without immunity (Appellant's Brief at 5 n. 3).[1] De Diego was then granted immunity by California and Florida, and

1. He was well acquainted with the ability of the federal government to grant immunity, having previously testified pursuant to a federal grant of immunity of August 15, 1972. (J.A. 41 n. 2).

called to testify on May 10 in the Dade County State's Attorney's office. On May 9, De Diego personally notified the FBI that he would be so testifying pursuant to a grant of immunity (Appellant's Brief at 5 n. 3). The immunized testimony contained a "play-by-play" description of how the break-in was accomplished (Tr. 78), and it was transmitted to the FBI on May 11, 1973, with the following explanation:

> [The Florida investigator] advised that he was making a copy of De Diego's twenty-one page statement available to Agents of the FBI *in accordance with the request of the Department of Justice.* He was placing no restrictions or stipulations on the use of this statement and he understood it would be made available to the Department of Justice for official purposes.

J.A. 30 [emphasis added].

The same day, the FBI forwarded a copy of De Diego's immunized statement to the United States Attorney's office for the District of Columbia. The Special Prosecutor did not attempt to show to the trial court that neither the FBI nor the U. S. Attorney for the District of Columbia used the immunized testimony in their investigations,[2] but rather concentrated his efforts on showing that the investigations of the Special Prosecutor's office were free from taint.

On May 25, 1973, the Watergate Special Prosecution Force was established. In addition to the obvious consultations that must have occurred between the FBI, the U. S. Attorney, and the members of the Special Prosecution Force in order to bring the latter up to date, on June 19, the FBI furnished the Special Prosecutor a 250 page report. De Diego's immunized statement was set forth

in full in that report (Affidavit of William H. Merrill, J.A. 46).

The Special Prosecutor submitted four affidavits in order to show that the investigations of the Special Prosecution Force were not tainted by use of the immunized testimony. One of the affiants (Philip Bakes) clearly remembers reading the immunized testimony, but states that he does not, to his recollection, remember using it in any way. One of the affiants (William Merrill) clearly remembers reading portions of the FBI report containing De Diego's statement, but does not, to his recollection, remember reading the immunized testimony or whether, if he read it, he used it. One of the affiants (Philip Heymann) clearly remembers that he "tried to read all FBI reports," but does not, to his recollection, remember whether he read De Diego's immunized testimony. Only one of the affiants (Charles Breyer) swore that, although he was aware that the testimony contained admissions, he did not read the immunized testimony. The admissions in these affidavits, not to mention possible uses of the testimony by the U. S. Attorney, the FBI, or members of the Special Prosecution Force, clearly support what was, if anything, the district judge's understated view that the prospects of removing taint were "dim."

In his brief, the Special Prosecutor cites seven pieces of evidence, available before De Diego gave his immunized testimony, that assertedly show that "the federal government had extensive evidence, wholly and unquestionably devoid of any taint, directly implicating him in the conspiracy with which he was charged . . . " (Appellant's Br. at 19). This description of evidence is set forth in full in the margin.[3] It shows

---

2. As the trial judge noted, Tr. 74–75, such proof would undoubtedly be necessary to remove taint.

3. 1. In the course of his investigation into the Watergate break-in, Earl J. Silbert, then Principal Assistant United States Attorney for the District of Columbia, learned from John W. Dean on April 15, 1973 that there had been a burglary of the office of Dr. Fielding, Daniel Ellsberg's psychiatrist, and

that Hunt and Liddy and others had been involved. This information was forwarded to Assistant Attorney General Henry Petersen on April 16, 1973.

 2. Silbert at that time had substantial corroborating evidence that Hunt and Liddy had been in Los Angeles on August 25–26, 1971 and again on September 2–4, 1971 and also that Hunt had been working on matters relating to the "Pentagon Papers"

that, even under the Special Prosecutor's description, De Diego was identified as a possible participant only in the extremely ambiguous Hunt testimony discussed above and by the fact that, in refusing to respond to the FBI without immunity, he said that "anything he did" he did

and Ellsberg while employed in the White House. Records of the Beverly Hilton Hotel in Beverly Hills, California, for example, showed that Hunt and Liddy had been in the Los Angeles area on the dates noted above, and the FBI report of an American Airlines stewardess, interviewed on June 29, 1972, established that Hunt and Liddy had taken flight 32 from Los Angeles to New York on September 4, 1971. Moreover, papers obtained from Hunt's White House safe and given to the FBI on June 26, 1972 included a folder marked "Ellsberg." The folder contained a document disclosing that Ellsberg had occupied a room at the Bel Air Motel in Los Angeles from December 30, 1970 to January 4, 1971, and had placed a telephone call to a psychiatrist named Dr. Lewis Fielding. Also found in Hunt's "Ellsberg" folder was an FBI report of July 20, 1971 which stated that Dr. Fielding had refused to provide any information concerning Ellsberg.

3. On April 27, 1973, Judge Byrne, who was then presiding over the trial of Ellsberg and Anthony J. Russo in the Central District of California, read in open court a statement concerning the alleged burglary and the alleged participation of Hunt, Liddy, and others. Judge Byrne ordered the government to undertake an investigation into the incident and to report its findings to him "forthwith."

4. On May 1, 1973, the FBI interviewed Efrain Juarez-Martinez and Maria Juarez-Martinez, who were janitors at the building where Dr. Fielding's office was located. They reported that on September 3, 1971 they had noticed the front door to the building unlocked. Upon entering they encountered two men who spoke Spanish and were either Cuban or Puerto Rican. The men stated that they were postal employees and had delivered a suitcase to Dr. Fielding's office. The janitors gave the FBI descriptions of both men and identified one from photographs as resembling Bernard Barker. Mr. Juarez-Martinez reported further that on the following night, September 4, 1971, he found the door open and Dr. Fielding's office ransacked. The file cabinets had been forcibly opened, papers and medicines were strewn about the floor, and there was no sign of the suitcase that had allegedly been delivered the previous night. He telephoned the police department.

because he thought it would help the United States. The Special Prosecutor further states, however, that "any conceivable taint which the federal government's access to this admission might have produced was completely dissipated on June 18, 1973 when, on his own initia-

5. On May 4, 1973, Egil Krogh submitted an affidavit to the United States Attorney for the District of Columbia for transmittal to Judge Byrne. The affidavit stated that on July 15, 1971 Krogh had been instructed by John D. Ehrlichman to begin a special National Security project to determine the causes, sources, and ramifications of the unauthorized disclosure of the "Pentagon Papers"; that Hunt, Liddy, and David Young had been assigned to the special project; that the special unit they established had received a report of Dr. Fielding's refusal to supply the FBI with any information concerning Ellsberg; that a psychological profile of Ellsberg prepared by the Central Intelligence Agency had provided no useful information; that the special unit had determined that "information in the possession of Dr. Fielding may hold the key to breaking the impasse"; that plans were then developed by Hunt and Liddy, with the general authorization of Ehrlichman, "to engage in covert activity to obtain" the information from Dr. Fielding; that Krogh agreed to the mission "with the understanding that Mr. Hunt and Mr. Liddy would obtain the service of certain Cubans to accomplish the mission"; that two trips to Los Angeles were taken by Hunt and Liddy pursuant to the plan; and that on the second trip, in early September 1971, an entry into Dr. Fielding's office was accomplished.

6. On May 2, 1973 Hunt gave extensive testimony to a grand jury in the District of Columbia concerning the Fielding break-in. Hunt described in detail the two entries and the surrounding events and identified the three Cubans who had participated in the actual break-in as Eugenio Martinez, Bernard Barker, and the defendant De Diego (21A).

7. On May 8, 1973, De Diego was interviewed by the FBI concerning his alleged participation in the Fielding break-in. The report of that interview stated that, after having been advised of his rights, De Diego said he "wanted it understood that anything he did he did because he thought he was working for the CIA and helping the United States Government." [Note: De Diego refused, however, to give testimony in the absence of a grant of immunity. See Appellant's Brief at 5 n. 3]
Appellant's Br. at 16–17.

tive and under no inducement whatsoever by the Government, De Diego arrived at [the U. S. Attorney's office and] admitted his participation in the Fielding break-in." (Appellant's Brief at 20). I find it curious that this evidence, which might go far toward removing taint (if there were, indeed, no tainted inducement), was not mentioned at any time in the trial court and is not supported on appeal by reference to any affidavit or document of record. It is clear that the trial judge cannot be faulted for making his decision on the basis only of the information before him.[4]

In sum, the trial court was faced with a situation in which a number of governmental officials involved in the investigation had read the immunized testimony, several of the prosecutors themselves could not say that they had not used it, and the only evidence implicating De Diego prior to receipt of the immunized statement was inconclusive. With this as background, the district court had to determine whether to (1) sever De Diego, (2) hold a full pretrial taint hearing, (3) hold taint hearings during trial as evidence was offered, (4) hold a post trial taint hearing, or (5) dismiss the indictment.

### 1. *Severance.*

The majority states that severance, presumably followed by a full pretrial taint hearing at some later date, was an appropriate solution. It was, in any event, an alternative that the district judge first brought up. The Special Prosecutor, however, objected to severance. In the oral argument on May 20, 1974, the following exchange occurred:

The Court: Possibly the solution of this dilemma is just to sever him out.

Mr. Breyer: I don't think that is the solution because I think in either event you are going to be faced with a very basic problem; and that is, was this testimony tainted or not.

Tr. 77.

Had the Special Prosecutor strongly pressed severance on the court, accompanied by assurances that trial would be sought immediately after the trial of the other defendants, we would have a different case. But it is clear that, far from doing that, he rejected the court's own suggestion of severance—a fact of which I cannot be oblivious in assessing his present claims of error.

The district judge noted ultimately in its oral ruling that severance would "run straight into the speedy trial problem." The majority asserts that a trial would have been held immediately following the main trial. Although this is possible, it is more common for the Government to await exhaustion of the appellate process in the main case before trying the severed case. In the absence of representations to the contrary, the district judge was fully justified in assuming that substantial delay would most likely occur and that, therefore, there would be a speedy trial problem.

The trial court stated in its oral ruling that "[i]t is difficult, if not impossible, to attempt to fully resolve the issue pretrial, not only because of the time factors which the Court has mentioned [causing great delay in the main trial], but the uncertainty as to what evidence the Government may be obliged to offer or will offer during the trial, particularly under the pressures of cross-examination." (Tr. 189–190). At the hearing the day before, the Special Prosecutor had asserted that the taint hearing would be quick and easy, involving only "one, perhaps two days,"[5] (Tr. 78) be-

---

4. One piece of evidence that the government did assert had alerted it to De Diego's participation was his federal immunized testimony on August 15, 1972. *See* Memorandum in Opposition to motion to dismiss, J.A. 41 n. 2. I can quite understand why this point is not raised in their briefs on appeal.

5. These oral representations contrast strongly with what the Special Prosecutor said in its written opposition to the motion to dismiss the indictment:

The following factors militate against a full pretrial hearing: (1) This is a compli-

cause all he intended to prove at trial was the conspiracy (which he claimed was shown in the Hunt testimony). He also asserted that the details of the break-in (which were the subject of much of the immunized testimony) would not be discussed at trial.

In a discussion with the Special Prosecutor, the district judge established to his satisfaction—reasonably, I believe—that the proof offered would not be limited to the mere fact of conspiracy, but would go into facts first appearing in the immunized testimony. I set this discussion forth in full because it reflects the extent to which the district judge moved beyond the abstract question of whether pretrial taint hearings were proper, to the question actually confronting him, namely, whether in the context of this trial, with the time constraints then existing and in light of the issues likely to be litigated, a pretrial taint hearing was feasible:

Mr. Breyer. . . . Whether a crowbar, the details as to whether a crowbar was used, whether a window was broken. It has a bearing on it and it corroborates it; but it is not the essential—

The Court. But you have Defendants who weren't there.

Mr. Breyer. That is correct.

The Court. So they are going to be questioning about such matters, whether you consider them pertinent or not.

Counsel for Colson, counsel for Ehrlichman, they weren't there, as I understand it, they didn't take a trip to Los Angeles. Their counsel are going to be asking all about how it happened and who gave the orders and who said what, and all the details. I suppose,

to extricate themselves from involvement in covert activities, which both of them will say they are ignorant of, they don't know anything about. They are not experts at covert activity, is what they will be saying to the jury, I assume. That isn't their bag, so to speak. They are lawyers in the White House. They didn't know all this business about what kind of ropes and what kind of crowbars and what kind of glass-cutters, and all that kind of thing you had to have to do this. They couldn't have ordered it; they [86] couldn't have known it.

Isn't that what they are going to say on the trial?

Mr. Breyer. I suppose that is what they are going to say. They are saying something further.

The Court. I am merely assuming in part but my trial experience suggests that would be a bit of that.

Mr. Breyer. They are going further. They are saying they didn't know any of the details but didn't even know of the broad plan. That is the allegation.

The Court. One of the arguments they make is that the details were of such a character and, obviously, they didn't know about any part of it because it was a different kind of ball game, a different conspiracy. They thought somebody was going out there to take pictures. That is the kind of argument you are going to have; and you are going to get into how it happened and who did what.

Mr. Breyer. I think to that extent we are going to do it; and to that extent, we are going to have to put on evidence from Howard Hunt, which we are prepared to do.

cated conspiracy trial where evidence against one defendant may be admissible against the others, specifically defendant De Diego. To prove that our evidence against De Diego was obtained without any use of the immunized testimony would require the Government to prove most of its case at a pretrial hearing; (2) *Since a full-scale evidentiary hearing may take one to*

*two weeks*, this could require the postponement of the trial, thus confronting this Court with the additional problem of completing this case so defendants John Ehrlichman and Charles Colson have sufficient time to prepare adequately for their trial in United States v. Mitchell, Crim. No. 74-110 (D.D.C.) . . .

J.A. 43 [Emphasis supplied]

The Court. He didn't go in.

Mr. Breyer. The evidence Howard. Hunt is going to give will concern certain admissions made by the Defendants upon their return with respect to the details of their entry.

The Court. Well, I have explored this with you at some length because I am concerned. The law issues are fairly [87] clear. I am concerned about the practical problems that confront me.

I think you have answered the questions that I had to ask.

Once it was established that evidence covered by the immunized testimony and not known prior to that testimony would probably be introduced, the trial court properly recognized that disproving taint would involve questioning "a vast number" of FBI agents, staff in the Special Prosecutor's office, and staff in the U. S. Attorney's office—a very complex and time-consuming task. As the district judge put it, "I dare say that that would be quite a hare's chase through the investigatory process." (Tr. 72).

In addition to all of the complications and difficulties in disproving taint in regard to the Florida testimony, it was clear that defense counsel intended to raise serious questions about government receipt and use of the May 11, 1973 continuation of the Florida testimony (which the government denied receiving) (Tr. 59, 65), and the use of immunized California grand jury testimony, which was made a matter of public record in September of 1973 (Tr. 90–91). The questions raised by the existence of these two additional sets of immunized testimony would undoubtedly have taken a significant time to resolve. In addition, I believe that the district judge was reasonable in expecting that, in a full taint hearing, issues concerning the earlier federal immunity would be raised: "Once we got started on immunity, we would be chasing all his immunity." (Tr. 76).

The district judge was thus faced with a situation in which a narrow taint hearing (focused on whether the proof of mere conspiracy was tainted) would reflect an unrealistic view of the evidence that would be used at trial; and a broad taint hearing would take considerable time, and also would essentially involve disclosure of the entire trial evidence and trial strategy. The majority suggests that the trial court objected to a pretrial hearing because of problems with public disclosure of evidence, and implies that the trial court erroneously failed to consider the possibility of an *in camera* proceeding. An examination of the transcript, however, shows the trial judge stating: "It would have to be in camera, because of the pretrial publicity problem and the fact that you would be exposing your evidence in advance." (Tr. 71). At that point, the Special Prosecutor responded: "We understand it would have to be in camera." (Id.). It is indicative of the dubious nature of the assistance rendered to the trial judge in this case that shortly *after* that statement, we find the Special Prosecutor saying: "We take no position at this point as to whether it should be held in camera or not." (Tr. 83).

In any event, it is clear that the judge and the Special Prosecutor were not in agreement as to the length of time necessary for the taint hearing. I believe the judge's estimate was much more realistic, and that, as the Special Prosecutor had earlier asserted in his written opposition, a full taint hearing could not have been held pretrial without postponing the trial itself, and thus interfering with the "cover up" trial scheduled for shortly thereafter.

3. *Taint hearings during trial.*

The Special Prosecutor suggested to the district judge that a preliminary hearing be held on whether the basic conspiracy could be proven without the use of tainted evidence, and that thereafter any immunity questions be answered by hearings during trial. Two of the judge's comments on that subject aptly and, I believe, correctly and beyond ca-

vil, characterize the problems with that approach:

The Court: That is a very impractical suggestion because every time Mr. De Diego's name is mentioned in the trial, all the lawyers will be standing up screaming, particularly Mr. Brigham; we will send the jury back to their sequestered comfort or discomfort, whichever it prove to be; and we will hold hearing-after-hearing out of their presence; this is infringing the immunity; that is infringing the immunity; the other thing is infringing the immunity. I am not going to do that either.

Tr. 73.

The Court: What do you say about your cross-examination status? We go to trial and the Defendants seek to minimize the break-in, and place the emphasis upon what they were after when they got inside. You have here from De Diego a very intimate detailed account of what took place inside Dr. Fielding's office, almost a play-by-play description of what was done. You then start questioning whoever is on the stand, talking about what happened inside the doctor's office; and at any moment you ask a question which, on its face, is derivative to De Diego's immunity statement. The whole trial stops; doesn't it? The jury goes out; and we have a hearing about what was in your mind, or whoever is the examining attorney, whether he has some recollection of this, or whether it was in De Diego's statement or whether it wasn't. We are headed toward a type of trial which is not very desirable.

Tr. 78–79.

4. *Post-trial taint hearings.*

The possibility of a post-trial taint hearing was neatly and accurately disposed of in the following colloquy between the trial judge and the Special Prosecutor:

The Court: . . . It would be outrageous to force a partially indigent person to leave his home and come and listen to a trial that may take two months, with the idea of finding out whether he should have been there or not. I am not going to do that.

Mr. Breyer: Nor would we suggest that, your Honor.

Tr. 72.

In sum, the district judge was faced with the possibility of (1) severance, which appellant opposed, (2) a pretrial taint hearing which, if it dealt with the entire range of evidence likely to be introduced, would unacceptably delay the trial and which even then, because the trial was of a number of conspirators, might not resolve all of the taint problems, (3) taint hearings during the trial, which would unduly interfere with an orderly trial and with the concentration of the jury, or (4) a post trial taint hearing which appellant conceded to be inequitable and which he disclaimed seeking. The backdrop to all of these problems was, of course, the determination that the possibility of appellant's proving lack of taint was, assuredly, "dim."

_____

The rule of Kastigar v. United States, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), creates certain problems where, as here, two states and the federal government grant one conspirator immunity in order to force testimony against the other conspirators, that testimony is then either passed around or made public, and finally there is an attempt to try the immunized person jointly with the other conspirators. It is true that such a trial is not impossible, but where, as here, the prosecutor advises the court against severance and presses upon it only the alternative of what would surely have been a prolonged taint hearing claiming the energies of all the parties to the impending trial just before it was to get underway, I believe that the district judge has an inherent power to dismiss the indictment with prejudice; and I would affirm its exercise in this instance.

I do not find any case authority, either in this jurisdiction or elsewhere, that

holds that only the prosecutor can do what the trial court did here. The majority refer in this connection to United States v. Weinstein, 452 F.2d 704 (2nd Cir. 1971), and United States v. Dooling, 406 F.2d 192 (2nd Cir.), cert. denied sub nom. Persico v. United States, 395 U.S. 911, 89 S.Ct. 1744, 23 L.Ed.2d 224 (1969). *Weinstein,* however, ruled only that a trial judge could not properly dismiss an indictment when, as Judge Friendly put it, "a jury has found a defendant guilty on evidence which was facially sufficient but which the judge, for well articulated reasons, could not credit." 452 F.2d at 705. *Dooling* also involved a post-verdict dismissal, with the trial judge relying principally on matters that had been considered and rejected without leave to renew before trial by another district judge; although the appeals court disapproved the particular dismissal, which it characterized as based on "vague and unsubstantial doubts," 406 F.2d at 197, it assumed in terms an inherent power on

the part of the district judge to dismiss in appropriate circumstances.[6] The majority also refers to the Confiscation Cases, 74 U.S. (7 Wall.) 454, 19 L.Ed. 196 1869. But the Supreme Court's opinion there merely held that the prosecutor had discretion to refuse to prosecute a case over the objections of a third party; it did not speak in any way to the powers of the district court.

The majority apparently agrees that the district judge has this discretion, *see* majority opinion note 7, but states "we find the asserted reasons for dismissal to be inadequate." *Id.* As said earlier, I believe that the decision of the district judge must be evaluated not only on the basis of the oral ruling on May 22, 1974, but by reference to what transpired at the hearing on May 21. In this more complete context, the district judge's reasons for ordering the dismissal are adequately within the bounds of his discretion.

6. As the majority notes, *Dooling* specifically recognized "the inherent power of a district court 'to do justice'" through dismissal. 406 F.2d at 196. The Ninth Circuit, in United States v. Heath, 260 F.2d 623 (1958) (cited with approval in *Dooling, supra*), stated:

The dismissal was, under the circumstances, within the inherent power of the District Court. It is established principle that all the authority of courts to do justice

is not encompassed either by rules or by statutes. Nor is the power of a court to prevent injustice circumscribed by their language.

Similarly, in Ex Parte United States, 306 F.2d 737, 738 (9th Cir. 1962). The court said, "This does not mean, of course, that the District Court lacks power to terminate a prosecution in a proper case [citations omitted]." *See also,* United States v. Apex Distributing Co., 270 F.2d 747, 756 (9th Cir. 1959).