UNITED STATES of America, Appellee,

v.

Fred ROMANO, Defendant, Appellant.

No. 78–1046.

United States Court of Appeals,
First Circuit.

Argued May 1, 1978.

Decided Aug. 11, 1978.

Francis J. DiMento, Boston, Mass., with whom DiMento & Sullivan, Boston, Mass., was on brief, for defendant, appellant.

James J. Graham, Atty., Dept. of Justice, Washington, D. C., with whom Edward F. Harrington, U. S. Atty., and Charles E. Chase, Asst. U. S. Atty., Boston, Mass., were on brief, for appellee.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

The question raised in this appeal from a criminal conviction is whether the Government's evidence was obtained in violation of the use immunity that had earlier been granted to the defendant, Ferdinand (Fred) Romano, under 18 U.S.C. §§ 6001–6005. Twice in the spring of 1976, Romano had testified under an order of immunity in

sessions of the Senate Subcommittee on Spending Practices, Efficiency, and Open Government—a subdivision of the Senate Committee on Government Operations—regarding the practices of G & G Packing Co., Inc., and Blue Ribbon Frozen Food Corp., Inc., sister companies that supplied the Department of Defense with over a million dollars worth of beef. Thereafter, Romano was tried and convicted by a jury on 27 counts of conspiring with other officers of G & G and Blue Ribbon to purchase for supply to the military a lesser grade of beef than required to satisfy military meat inspectors; giving or offering a thing of value to military meat inspectors; and concealing a material fact concerning the quality of the meat, in violation of 18 U.S.C. §§ 201(f), 371, 1001 and 1002.

Before trial, the district court held a three-day hearing in response to Romano's motion to dismiss the indictment or suppress evidence on the ground that the Government's evidence was obtained in violation of his immunity grant, see 18 U.S.C. § 6002.[1] After the hearing, the court denied Romano's motion, and subsequently reaffirmed its decision in a Memorandum and Order entered on December 14, 1977, after verdict was rendered. The court ruled that "the United States had met the heavy burden imposed by *Kastigar v. United States*, 406 U.S. 441, 460–62 [92 S.Ct. 1653, 32 L.Ed.2d 212] (1972), and had shown that the source of the evidence that the Department of Justice intended to use in the Romano prosecution originated from sources completely independent of Romano's immunized Senate testimony." The district court also found that a proffer of evidence made in October 1975 by Romano's counsel to members of the Subcommittee in order to obtain a grant of immunity was not the source of any evidence relied on by the Government either before the grand jury or at the trial, and, additionally, that the information contained in the proffer was not insulated from Government use by the terms of § 6002 or the *Kastigar* decision. On appeal,

Romano vigorously assails these rulings. We affirm.

## I

At trial the Government's evidence revealed the following. Blue Ribbon and G & G were in the business of supplying meat to the Department of Defense, under government contracts. They were owned by Harry Goldberg and David Frank Goldberg, who also had a substantial role in day-to-day operational decisions. Appellant Romano and one Frank Ravasini served respectively as general manager and assistant general manager of G & G. Stephen Goldberg, son of Harry Goldberg, ordered and purchased beef to be processed at G & G. Edward Kehl and William Johnson were appointed quality control representative and foreman of general help at G & G after it began operations in the spring of 1974. G & G, a Massachusetts firm, did preliminary processing of raw beef, which was sent to Blue Ribbon in Connecticut for further processing before it was shipped to the military.

During the latter half of 1974, Romano, Harry Goldberg, David Frank Goldberg, and Frank Ravasini determined to increase G & G's profits by substituting ungraded and inferior cuts of beef for those specified by the Department of Defense. Bribes were arranged between G & G and Charles Reidinger, an Army officer in charge of assigning inspectors to the G & G plant, and Manuel Pacheco, Nadja Hoyer-Booth, and Sharon Dalton, three inspectors. In 1974 and 1975, those officers received cash payments, meat, liquor, clothing, and other offerings in kind in return for less than rigorous examination at the plant. The Government, in the meanwhile, paid G & G over $895,000 more than the meat it received was worth.

Testifying against Romano at trial were both Goldbergs, who had earlier pleaded guilty to similar charges, Johnson, Edward Kehl, and the inspectors Hoyer-Booth and

1. For the text of § 6002, *see infra.*

Pacheco.[2] Additionally there was expert testimony and documentation that the meat supplied by Romano's company was below specification. No defense was offered. On November 17, 1977, after a four-day trial, the jury returned verdicts against Romano on 27 counts.

Over two years before Romano was tried and convicted, the Senate Subcommittee on Spending Practices had begun an inquiry into military procurement practices. The Subcommittee was helped in its preliminary investigative work by a branch of the Department of Defense called "Defense Investigative Services" (DIS). The investigation was enlarged in September 1975, when James J. Graham of the Department of Justice's Fraud Division began a parallel investigation looking towards prosecution of the participants in the fraud. The Department of Justice received the cooperation of the DIS unit which was doing field work in Boston and Connecticut.

On October 8, 1975, Romano was subpoenaed before a public session of the Subcommittee with his counsel, James J. Sullivan, of Boston. Asserting his fifth amendment right, he refused to testify.[3] Later that day, Sullivan and the attorneys for the Goldbergs conferred with Senators Chiles and Weicker, chairman and a ranking member of the Subcommittee, about the possibility of arranging for their clients to testify before the Subcommittee in return for a grant of use immunity. The detail and scope of the proffer made by Sullivan on behalf of Romano at this lobby meeting is not disputed; but the proffer was, at best, a "general" one outlining Romano's willingness to testify about some practices of G & G including the substitution of inferior for the specified cuts.[4]

The following day, October 9, 1975, Senators Chiles and Weicker met with Graham and told him of the proffers. On November 13, 1975, the Committee voted to request an order of immunity for Romano in order that he could be compelled to testify. The Department of Justice, through Graham, urged that the Subcommittee not seek immunity, explaining that the prosecutorial task would be complicated by an immunity grant. An order was nonetheless sought and on November 25, 1975, the District Court for the District of Columbia entered an order under 18 U.S.C. § 6005 conferring immunity and compelling Romano's testimony.[5] The Subcommittee agreed to hold the order in abeyance at least until receiving a statement from Attorney General Levi formally articulating the Justice Department's position on the matter.

In a letter to the Subcommittee, drafted by Graham and signed on December 24, 1975, the Attorney General expressed "the strongest objection" to a grant of immunity at that time, counting among his reasons that "the proffer . . . is very general in nature and may implicate only low-level government employees" and that "because of the close relationship established by your Subcommittee with our investigators, proof that the immunized testimony was never used to develop future cases against witnesses could present serious litigation problems, if not an absolute bar to prosecution."

2. Reidinger, Pacheco and the two corporate defendants also pleaded guilty pursuant to plea agreements.

3. Harry Goldberg invoked the fifth amendment privilege at the same session of the Subcommittee.

4. The evidence is particularly hazy about the differences between the proffer made by the Goldbergs' counsel as opposed to that made by Sullivan on behalf of Romano.

5. Section 6005 provides in part:
   "In the case of any individual who has been or may be called to testify or provide other information at any proceeding before either House of Congress, or any committee, or any subcommittee of either House, or any joint committee of the two Houses, a United States district court shall issue, in accordance with subsection (b) of this section, upon the request of a duly authorized representative of the House of Congress or the committee concerned, an order requiring such individual to give testimony or provide other information which he refuses to give or provide on the basis of his privilege against self-incrimination, such order to become effective as provided in section 6002 of this part."

He further stated that "the meat packing investigation is just beginning in response to the referral of your Subcommittee and certain scientific tests" and cautioned that the heavy burden of the prosecutor to show independent legitimate sources and freedom from taint "presents no small hurdle in light of the established and documented relationship between the Subcommittee and its staff and our investigators, the Defense Investigative Service. Certification or sealing of the evidence is an insufficient safeguard here, since the investigation is still at an early stage."

The Subcommittee accordingly delayed hearing the testimony of Romano. In early April 1976, a grand jury began investigation of Romano and was presented with depositions of Pacheco and Reidinger and the testimony of Hoyer-Booth, Johnson and Kehl. Romano's testimony was finally scheduled for a closed executive session of the Subcommittee on April 29, 1976. Graham drafted and circulated a memo dated April 19, 1976, alerting his staff and the DIS staff to the upcoming testimony, and directing them to avoid all access or contact with any reports, personal or journalistic, of the testimony. On April 25, 1976, two DIS employees assigned to Romano's case drafted a memo summarizing the case against Romano as it stood before any testimony was taken: the memo refers to testimony of Edward Kehl and interviews with Hoyer-Booth as well as other unnamed sources, and details the substitution of cuts and bribery with which Romano was subsequently charged. On April 27, 1976, two days before Romano's scheduled testimony, the Department of Justice through the Attorney General received a packet of materials from Senators Chiles and Weicker, outlining "all evidence and 'leads' gathered by the subcommittee, particularly information which may not yet have come to the attention of the Justice Department, and which may suggest criminal wrongdoing by Mr. Romano."

Finally, on April 29, 1976, Romano testified before the Subcommittee. A press conference on the subject of the hearings, covering the evidence accumulated to date, was held by the Subcommittee on May 7, 1976, and received "fairly heavy press coverage." Romano again testified before the Subcommittee at a public session on May 13, 1976.

Romano was indicted on February 2, 1977. On March 14, 1977, he filed a motion for discovery and to dismiss the indictment or suppress evidence allegedly derived from his testimony.

## II

We first consider if either the fifth amendment or the use immunity statute, 18 U.S.C. § 6002—interpreted in *Kastigar v. United States, supra,* 406 U.S. at 448–62, 92 S.Ct. 1653, as "coextensive" with the Fifth Amendment—barred any possible derivative use of information in the proffer made by Romano's attorney on October 8, 1975, to members of the Subcommittee. The proffer preceded the granting of immunity by well over a month, and came over five months before Romano was compelled to testify.

This circuit has held that a proffer that was not followed by testimony pursuant to an immunity grant is not protected from use. *United States v. DiMuro,* 540 F.2d 503 (1st Cir. 1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 733, 50 L.Ed.2d 749 (1977); *see United States v. Rothman,* 567 F.2d 744 (7th Cir. 1977), even when an order of immunity had been obtained by the Government under 18 U.S.C. §§ 6003–6005 in anticipation of testimony. Endeavoring to distinguish *DiMuro,* Romano contends that the fruition of his proffer in protected testimony operated retrospectively to attach use immunity to the proffer.

However, the language of § 6002 does not support this position. That section provides in pertinent part:

"Whenever a witness refuses, on the basis of his privilege against self-incrimination, to testify or provide other information in a proceeding before or ancillary to—

. . . . .

(3) either House of Congress, a joint committee of the two Houses, or a committee or a subcommittee of either House, and the person presiding over the proceeding communicates to the witness an order issued under this part, the witness may not refuse to comply with the order on the basis of his privilege against self-incrimination; *but no testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case, except [for] a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order."* [Emphasis supplied.]

Romano argues that Attorney Sullivan's proffer is "other information" whose use is barred by the statute's prohibition against reliance on "any information directly or indirectly *derived* from such testimony *or other information.*" [Appellant's emphasis.] But the statute will not bear that reading. The parallel construction in the phrases emphasized above indicates that the "such testimony or other information" of which derivative use is prohibited, refers to the "testimony or other information compelled under the order" whose direct use is banned in the phrase immediately preceding. By definition, a proffer cannot be considered testimony or information compelled by an order since, when made, no order has issued. Nor can it logically be said that in some sense a proffer is directly or indirectly derived from subsequent protected testimony. Such a causal relation is chronologically impossible. *Cf. United States v. Rothman, supra* at 746–47; *United States v. DiMuro, supra* at 517.

■ Romano attempts a policy argument to the effect that permitting use of a proffer that results in protected testimony would discourage legitimate use of the immunity statute by "impair[ing], if not eliminat[ing] any communication between counsel for a witness and an investigative body." Romano warns that such a rule would burden the negotiations for immunity by imposing a great risk on a proffer

detailed enough to satisfy an investigative body that a grant of immunity would be in fair exchange. The immunity conferred on a party who makes a proffer and testifies under a § 6005 order is not transactional immunity, however, but use and derivative use immunity. The investigative body does not need to learn a great deal about the witness's expected testimony in order to avoid buying "a pig in a poke": if the later testimony is useless, the scope of the immunity will be correspondingly small. A general and brief outline of the areas in which the potential witness could aid the investigation might normally suffice. In any event, circumspection will necessarily characterize proffers of testimony in return for this limited immunity: when a proffer is made there can never be any certainty that it will result in a grant of immunity—this is a fact of life the person seeking immunity must face. *See United States v. Rothman, supra; United States v. DiMuro, supra.* These factors help explain why the proffer made in the present case by Romano's experienced counsel was couched in terms so broad that the district court felt it served neither as a direct nor indirect source of subsequent Department of Justice inquiry.

■ The fifth amendment of the Constitution affords no greater protection to the proffer than do the terms of § 6002. The keystone of the Court's reasoning in *Kastigar* was that if the immunity from use and derivative use embraces the scope of the privilege against self-incrimination, compelling disclosure while maintaining such immunity is consonant with fifth amendment standards. 406 U.S. at 453–59, 92 S.Ct. 1653; *see United States v. DiMuro, supra* at 517. Romano's proffer was not part of the information given in exchange for use immunity. Appellant was not compelled to make the proffer, *cf. Adams v. Maryland,* 347 U.S. 179, 180–81, 74 S.Ct. 442, 98 L.Ed. 608 (1954). He could silently have refused preliminary advances by the Government regarding immunity, if there were any. There is, therefore, no fifth amendment barrier to use of any hint the Government may have gleaned from the brief encounter

that Romano's counsel voluntarily had with Senators Chiles and Weicker.

■ The Government would not, of course, be free to trick a potential witness by requiring detailed self-incriminatory statements as a so-called "proffer" while reassuring the witness that these would not be used for the purpose of further investigation. The due process clause of the fifth amendment is a shield against unfair or deceptive treatment of an accused by the Government. One can, of course, speculate that an inept lawyer might some day thoughtlessly let the cat out of the bag to the later detriment of his client, but the problems in this regard are probably no greater than in other situations where a guilty person is trying to save his skin by opening negotiations with the Government. The district court correctly ruled that even hypothesizing some later use or derived benefit from the proffer, the information in the proffer "is not insulated from use by the Government."

### III

■ Romano also challenges the district court's finding that the prosecution's case against him was not "tainted" in the sense of being derived in some measure from the immunized testimony which he earlier gave before the Senate Subcommittee, and was instead derived from wholly independent and legitimate sources. *Kastigar, supra,* 406 U.S. at 460–62, 92 S.Ct. 1653; *Murphy v. Waterfront Commission,* 378 U.S. 52, 79 n.18, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964). As the Attorney General himself recognized in his protest, it was unfortunate strategy to compel Romano to testify under grant of immunity prior to the time he was tried. The Government's burden both to disprove taint and demonstrate independent sources for its case is a "heavy" one. *Kastigar, supra,* 406 U.S. at 461–62, 92 S.Ct. 1653.

We are satisfied, however, that the findings of the district court on this issue are sufficiently supported. The question of whether any use, derivative or otherwise, was made of the compelled testimony by the prosecution, is one of fact on which, as here, the district court ordinarily holds a separate hearing. *See United States v. De-Diego,* 167 U.S.App.D.C. 252, 258, 511 F.2d 818, 824 (1975). Unless clearly erroneous, the court's conclusion is binding. *United States v. Jones,* 542 F.2d 186, 197, 199 (4th Cir. 1976); *cf. United States v. Jobin,* 535 F.2d 154, 156 (1st Cir. 1976).

Beyond giving full effect to the substantiality of the Government's burden, we need not become too enmeshed in fitting it into classic burden-of-proof rubric. The Fifth Circuit has held, by analogy to the standard used in determining the voluntariness of a confession, that the "heavy" burden placed on the Government may be met by proof to a preponderance of the evidence. *United States v. McDonnel,* 550 F.2d 1010, 1012 (5th Cir.), *cert. denied,* 434 U.S. 835, 98 S.Ct. 123, 54 L.Ed.2d 96 (1977); *United States v. Seiffert,* 501 F.2d 974, 982 (5th Cir. 1974). *Cf. Lego v. Twomey,* 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972). Cases cited by appellant as authority for requiring more than a preponderance do not purport to enunciate the standard that must be met; they finesse the question by evaluating the evidence in light of the only explicit statements by the Supreme Court, *i. e,* that the Government bears "the heavy burden of proving that all of the evidence it proposes to use was derived from legitimate independent sources," *Kastigar, supra,* 406 U.S. at 461–62, 92 S.Ct. at 1665, and "this burden of proof . . . imposes on the prosecution the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony," *id.* at 460, 92 S.Ct. at 1665. *See, e. g., United States v. Nemes,* 555 F.2d 51, 55 (2d Cir. 1977); *United States v. Bianco,* 534 F.2d 501 (2d Cir. 1976); *United States v. DeDiego, supra,* 167 U.S.App.D.C. at 256, 511 F.2d at 822; *United States v. Catalano,* 491 F.2d 268, 272 (2d Cir.), *cert. denied,* 419 U.S. 825, 95 S.Ct. 42, 42 L.Ed.2d 48 (1974); *United States v. McDaniel,* 482 F.2d 305, 310–12 (8th Cir. 1973). *But cf. United States v. Hinton,* 543 F.2d 1002, 1008 (2d Cir. 1976).

However the formula is stated, we think this record adequately supports the conclusion of the court below. Defendant's fate was assuredly sealed well before he testified under grant of immunity. To disprove taint and establish its independent sources, the Government offered testimony regarding the sources of the 51 different counts of the indictment,[6] documentary evidence indicating that the Government's case was largely established before Romano testified, and affidavits of many investigators to the effect that they had complied with the instructions of the prosecutor, Graham, to avoid media reports and discussion of the anticipated testimony. The Government also elicited testimony describing a purported "one-way street" relationship that was established in late 1975 between the Subcommittee and the Department of Justice investigatory staff, under which the Subcommittee would be apprised of Justice's progress, but Justice would not receive information from the Subcommittee. Finally, the Government argues that despite extensive discovery and ample time for examination of the investigative documents and grand jury transcripts, Romano has been unable to unearth any communication or link between his testimony and the criminal case that is suggestive of taint.

The district court did not attempt an *in camera* examination of all the documents discovered by Romano, *compare United States v. Bianco, supra,* but in this regard relied on the fact that appellant despite extensive discovery failed to bring any improperly derived information to the attention of the court and on the Government's representation that the documents were largely irrelevant. The court stated that its conclusion that there was no taint was reinforced by observation of the testimony and documentary evidence adduced at trial, as well as review of Romano's Subcommittee testimony.

■ To upset this analysis, Romano points to various alleged inconsistencies in

the evidence which, he says, require a finding that the Government failed to meet its heavy burden. Romano maintains that there should have been detailed affidavits not only from some investigators but from every person connected with the case disavowing any contact with Romano's Subcommittee testimony. While the Government clearly would not be entitled to rely entirely on one or two conclusory affidavits to carry its burden, *see United States v. Nemes, supra,* the Government made a much more detailed presentation here, and did not attempt to invoke reliance merely on the good faith of the prosecutor, *see Kastigar, supra,* 406 U.S. at 460, 92 S.Ct. 1653, in order to negate taint. Much obviously depends on all the facts and circumstances of a particular case. Here we think it was not necessary, nor would it have been particularly meaningful to require that every individual in any manner affiliated with the investigation provide an affidavit denying contact with the testimony. Affidavits from principal investigators were provided and there was much additional evidence—and nothing to the contrary—establishing lack of taint. Circumstantially, moreover, there was nothing to suggest that the Government needed Romano's testimony to help make out its case.

■ Romano also highlights inconsistencies in the pretrial testimony concerning the "one-way street" policy that the Government claimed insulated its operations from Subcommittee activity. He argues that these flaw the Government's demonstration of legitimacy. None of these alleged inconsistencies significantly impugns the post-testimony investigatory work of the Government, however, and since immunity did not attach to the proffer, any uncertainties about the extent of pre-testimony cooperation between the Subcommittee and the Department of Justice are immaterial to the questions of taint and legitimacy.

■ Romano claims that the Subcommittee's distribution of portions of its evi-

6. The prosecutor testified that each of the counts was derived from the information gathered from the business records of the compa-

nies or from interviews conducted with other participants in the fraud.

dentiary material to the media at a press conference on May 7, 1976, could have tainted the Department of Justice investigation. But Romano can refer to no revelation made in the press conference that might have influenced the Government's case, which was in great measure established at that point. Though it may not have been wise from the prosecution's view to make such a release, the Subcommittee's action cannot be said to demonstrate clear error in the district court's finding.

Finally, Romano speculates that the Government may have used the immunity order as leverage to obtain the testimony of other witnesses. The district court foreclosed inquiry in this regard at the pretrial hearing. In *United States v. Kurzer*, 534 F.2d 511 (2d Cir. 1976), the Second Circuit indicated that *Kastigar* proscribed *any* use of immunized testimony, including pre-testimony "whipsawing" one witness to testify against a second with the prospect of the second's immunized testimony. The court there ruled that the motivation of the first witness in such a situation was a legitimate subject of inquiry in a taint hearing.

It is possible here that the precise grounds for Romano's attempted inquiry were not made explicit to the trial court; and Romano made no offer of proof. Even discounting these deficiencies, however, no obvious prejudice accrued to Romano as a result of this evidentiary ruling. In *Kurzer*, the two witnesses implicated each other when caught in a variation of the prisoner's dilemma that logicians pose. In Romano's case, by contrast, the horns of the dilemma were blunted: a number of other wrongdoers were involved, many of whom could have—and did—implicate Romano. Further, the Subcommittee investigation had focused on G & G and Blue Ribbon well before even a proffer was received. Without deciding to what extent we accept the Second Circuit's view of the importance of a witness's motivation to testify, we hold that the foreclosure of inquiry in this instance did not amount to reversible error.

*Affirmed.*