

Asst. U.S. Atty. Lydia Lizarribar, Hato Rey, Puerto Rico, for plaintiff.

Blas Herrero, Hato Rey, Puerto Rico, for defendants.

### OPINION AND ORDER

CEREZO, District Judge.

This case involves a three count indictment filed on October 31, 1985 against José Tormos Vega (Tormos), Juan Luis Boscio (Boscio) and Miguel Serrano-Arreche (Serrano). Defendant Serrano is charged only in the first count which alleges that he conspired with Tormos and Boscio to obstruct commerce by extortion in violation of 18 U.S.C. Sec. 1951. Presently before us is an appeal from the report issued on November 21, 1986 by U.S. Magistrate Castellanos recommending that the motions to dismiss the indictment filed by defendant Serrano on January 3, 1986 (docket entry 54) and on April 11, 1986 (docket entry 151) be granted. The Report and Recommendation was issued after an extensive evidentiary hearing. Both of these motions charge that the evidence presented to the grand jury in this case was obtained directly or indirectly from the immunized testimony offered by movant on September 25, 27 and 28, 1984 before a sub-committee of the House of Representatives of Puerto Rico that was investigating government corruption. Defendant Serrano contends that the government, because of ignorance of its own guidelines concerning an immunity/compelled testimony situation, has flagrantly violated the constitutional proscription that, once a state witness gives compelled testimony which may be incriminating, the federal government is prohibited from making any use of the compelled testimony and its fruits in connection with a criminal prosecution against him. The

**UNITED STATES of America, Plaintiff,**

v.

**Jose TORMOS–VEGA, Juan Luis Boscio and Miguel A. Serrano-Arreche, Defendants.**

Crim. No. 85–0449(CC).

United States District Court, D. Puerto Rico.

April 8, 1987.

Government argues that it has not violated any constitutional proscription concerning the use of immunized testimony for it has established that the disputed evidence was derived from sources wholly independent from such testimony. The inquiry on the government's alleged violation of Serrano's rights centers on whether or not case agent Harry Garcia made use of the protected testimony in procuring the indictment. In order to examine this fundamental issue, we must make an in depth examination of case agent Garcia's handling of the evidence before and after Mr. Serrano's immunized testimony.

Prior to Serrano's testimony before the legislative committee, the case had been assigned to special agent Frank Gallagher who had conducted since November 1983 a couple of interviews or "contacts" with Commonwealth Treasury officials and one René Sotomayor, former Director of the Home Federal Savings and Loan of Puerto Rico.[1] On February 19, 1984, the investigation generally referred to as Shearson-American Express, comprising the transactions involved in this case as well as two other criminal cases, Criminal 84-381 (JP) and Criminal 85-24 (GG)[2], was assigned to agent Garcia who was also handling at the time fifteen other cases. According to the testimony he gave before the Magistrate, he could only devote 20 to 25% of his time to the Shearson investigation. As of September 17, 1984, just days before Serrano's

immunized testimony, agent Garcia had "thousands and thousands of documents involving the documents from the search warrant (he) was still reviewing".[3] He explained that, as of September 17, 1984, he didn't know that he had all the evidence that he needed because he "had all of these documents to go over at that point."[4] When he was twice asked about the status report he gave to U.S. Attorney Lopez Romo on September 17, 1984, approximately one week before Serrano's testimony, informing that he had enough evidence in the Shearson-American Express investigation, he answered: "At that point I had evidence really for case 84-381 and 85-24".[5] During the August 18, 1986 hearing, referring to the investigation of the instant case, he again mentioned the thousands of documents submitted which he had been unable to read because of a heavy workload and time restrictions.[6] Questioned by defense counsel as to what was lacking as of September 1984, the key date in this situation, to obtain an indictment, Garcia answered that he "needed to review documents" and "needed to finish some interviews"[7]. He could not recall what interviews he needed to finish because of the thousands and thousands of documents he had. He could not recall either what documents he had to review before seeking an indictment. He acknowledged that just before Serrano's immunized testimony he only had a "general idea of the case"[8].

---

1. Transcript of Hearing of Motion to Dismiss held on August 12, 1986, p. 13.

2. In criminal 84-381 (JP), Serrano pled guilty to three counts involving violations to 18 U.S.C. sections 1006 (false entries in documents of federal credit institutions), 656 (misapplication of bank funds) and 1343 (fraud by wire). That case involved a series of fraudulent transactions with a now bankrupt savings and loan association called Home Federal Savings and Loan Association of Puerto Rico whereby Serrano would illegally retain part of the amounts entrusted to him by the institution for investments. The Court's denial of a motion to withdraw the plea of guilty and subsequent conviction is now on appeal. In criminal 85-24(GG), Serrano was found guilty by a jury on all four counts of violations to 18 U.S.C. sections 1341, 1342 and 1343 (mail and wire fraud). That case involved a scheme to defraud Home Federal Savings and Loan Association of approximately $1.7 million dollars worth of mortgage collat-

eral which was used by Serrano to obtain other loans. Said case is also on appeal. Given defendant Serrano's constant references to alleged violations of his Fifth Amendment rights in those cases, we note that this opinion and order is only concerned with the indictment and prosecution against Serrano in the instant case, criminal 85-449. We do not, and cannot, pass judgment on anything that transpired in the other two cases now on appeal.

3. Transcript of August 12, 1986, p. 36.

4. Idem.

5. Transcript of August 12, 1986, at p. 36, 55.

6. Transcript August 18, 1986, p. 58.

7. Transcript August 18, 1986, pp. 62-63.

8. Transcript August 18, 1986, p. 75.

Just days before Serrano testified under immunity, both agent Garcia and U.S. Attorney Lopez Romo, knew about it because Serrano and his attorney had met with them to seek immunity from federal prosecution and they had discussed his imminent appearance before the Puerto Rico Legislature in televised hearings. Even though U.S. Attorney Lopez Romo mentioned at this meeting the possibility of a "Waterfront" situation, when the awaited day arrived both agent Garcia and Mr. Lopez Romo were among the thousands of viewers eagerly watching Serrano's televised testimony. At the hearings before the Magistrate, U.S. Attorney Lopez Romo emphatically stated:

"Hold it, if I may, as to his (Serrano's) testimony before the Legislature, there was no need to keep me informed. I was watching the testimony.

Q. How did you watch the testimony?

A. I have a small television in my office.

Q. Did you see and how many hours did you see?

A. Oh, let me see, about three hours, especially the day in which he came out. I wanted to see how he was going to go around the waterfront (sic) situation that we had discussed."

Agent Garcia also viewed four or five hours of the testimony at his office while it was being transmitted and made arrangements to videotape most of the hearings before the House of Representatives which lasted from 12 to 15 hours.[9] Besides making the videotapes, agent Garcia instructed a secretary at the F.B.I. to make transcripts of the Serrano testimony from the videotapes. He subsequently obtained copies of a 303-page transcript of that same testimony which was prepared by court reporter Fernando Altamirano who was instructed by Garcia to reproduce only Serrano's testimony. The invoices for the transcript and the corresponding translations, paid by the F.B.I., totalled approximately $308.50.[10] Altamirano stated in a written

certification that the "transcript was hand delivered to the U.S. Attorney's office, Criminal Division, in San Juan, Puerto Rico, to the attention of AUSA Lydia Lyzarribar, following the instructions of F.B.I. Agent, Harry Garcia".[11] There was no testimony on whether the videotapes and transcripts were kept in a secure place with restricted access. Garcia, apparently, was in control of these materials and they were readily accessible to him for he examined them on various occasions.

Garcia admitted viewing the entire Serrano videotaped testimony three or four times "looking for information" for this case.[12] He reaffirmed earlier testimony given by him in Cr. 85–024 in the sense that "the main thing that came out of those tapes were the alleged kickbacks that were paid to ex-mayor Tormos and Attorney Juan L. Boscio" and further acknowledged that those kickbacks are "what this indictment is all about"[13]. Garcia stated several times that he only used the immunized testimony to "corroborate" what he already had in the case. When asked specifically what he wanted to corroborate with Serrano's immunized testimony, the following dialogue ensued:

"What I said I wanted to corroborate was in general. There was nothing specific I was trying to corroborate. Before the hearings there was nothing specific, if that is your question."

Q. "You were going to say before the hearings started there was nothing. What do you mean there was nothing?"

A. "There was nothing specific. Your question was what specific in the ..."

Q. "In other words, you wanted to get the specifics out of Serrano's immunized testimony although you had the general idea of what had been going on. That is what you wanted to corroborate? Would that be a fair question?"

A. "Not really, because, like I said, I had a general idea, there were a lot of

---

9. Transcript August 18, 1986, p. 59–66.

10. Transcript August 6, 1986, pp. 11–12.

11. *Idem* at pp. 14–15.

12. Transcript August 11, 1986, p. 23, 30–31.

13. *Idem* 31, 32.

issues in the case and when I looked at the tapes-when I looked at the tapes there was nothing specific in these exhibits [14] that I was looking for but I felt I needed to look at the whole hearings. Being the case agent I felt I needed ... They were public and I felt that I should look at the whole thing."

He was then asked by defense counsel if it would be a fair statement that he was:

"generally looking at the tapes to generally corroborate all that he had up to that point"

And he answered in the affirmative. When defense counsel inquired whether he was looking for a specific thing such as kickbacks, he said that:

"the only thing that came out when he testified was the distribution of the $660,000 which turned out to be the same monies mentioned here in 1–12" [15].

Although agent Garcia repeatedly denied having developed any investigative leads from Serrano's immunized testimony, he admitted that he first acquired knowledge about everything in relation to the Florida Festival meeting from Serrano's testimony.[16] The parties have generally referred to a meeting between the three indicted conspirators in this case, Tormos, Serrano and Boscio, as the Florida Festival, a shopping mall area in Orlando, Florida where they allegedly conspired during early September 1984 to cover up the events related to the payments of $220,000 mentioned in the indictment. Serrano also testified that a few days later Tormos approached him and asked for his participation in a scheme to cover up the payments by disguising them as a $75,000 loan, evidenced by three promissory notes Tormos had produced.

Six days after Serrano testified before the House, defendant Tormos, a resident of Longwood, Florida, was contacted by the FBI Tampa office in response to a request made by agent Garcia from San Juan. The Government's 302 report of this contact states:

"Mr. Torma (sic) was contacted and advised of the events concerning allegations of kickbacks received while he was the Mayor of Ponce, Puerto Rico. Torma (sic) was advised that he had been implicated in receiving a kickback for $110,-000, and providing documentation to disguise the kickback. Torma (sic) was asked if he would be willing to speak to the FBI regarding the allegations".

When agent Garcia was asked why he had Tormos contacted, the following dialogue took place:

Q. "So you send (sic) the request to interview Tormos Vega to the Tampa Office?

A. That is correct.

Q. And why did you want him interviewed?

A. I had him contacted to see if he would be willing to speak to the FBI referring to the allegations that were made.

Q. And why did you want him interviewed?

A. I had him contacted to see if he would be willing to speak to the FBI referring to the allegations that were made.

Q. What allegations?

A. The allegations of kickbacks.

Q. Who made those allegations?

A. Mr. Serrano.

Q. Where?

A. At the hearings.

Q. What hearings?

A. Hearings at the Senate.[17]"

The 302 report which corresponds to the October 3, 1984 initial interview of Mr. Tormos by the FBI indicates that Tormos expressed he would "most definitely speak to a grand jury, the Courts or the FBI regarding the matter". The 302 report of the following day, October 4, 1984, refers to a contact made by telephone by Tormos "regarding his interview with the FBI". It is there reported that Tormos requested to speak to FBI agents regarding the kick-

---

**14.** Referring to Government's Exhibits 1 through 12 which were investigation materials.

**15.** Transcript August 18, 1986, p. 70.

**16.** Transcript August 11, 1986, p. 118.

**17.** Transcript of August 11, 1986, p. 67.

back allegations during the period he was Mayor of Ponce. On October 8, 1984 Tormos furnished the FBI a signed statement entitled To Whom It May Concern where he discusses his version of the facts, namely, that he obtained a personal loan of $75,000, assisted by Boscio, to whom he gave three (3) promissory notes, payable to bearer, of $25,000 each. He alleged that the loan was disbursed through 75 blank money orders of $1,000 each that he received from Boscio. On January 16, 1985 codefendant Boscio appeared voluntarily at the FBI offices. His 302 report indicates that he received an envelope with 120 money orders in the amount of $1,000 each which he personally hand delivered to Serrano who gave him $10,000 in money orders as a personal loan and asked him to deliver the remaining $110,000 to Tormos, explaining that he was giving the money to Tormos as a favor for he needed it to help one of his sons start a business. Boscio was then confronted with the written statement made by Tormos on October 8, 1984 and he rejected as false significant matters contained in Tormos' version of the facts. The Boscio and Tormos testimonies before the grand juries investigating the Shearson transactions were essentially the same as their prior statements to the agents. Their testimonies were read to the indicting grand jury.

On October 31, 1985 agent Garcia appeared before the grand jury that issued the indictment in this case. He basically did two things: (1) explain to the grand jurors the details of the investigation conducted by him, and, (2) read the testimonies of Boscio and Tormos before a prior grand jury that issued indictments in the other two cases against Serrano. During his explanation to the grand jury, Garcia summarized the evidence in relation to the conspiracy and extortion charges. On various occasions he leaked to the grand jurors the fact that Serrano had testified under local immunity about matters related to the case that was being presented to them. Garcia went as far as to testify before the grand jury on specific matters, which the Government has admitted, were first mentioned in Serrano's immunized testimony before the Legislature. Upon A.U.S.A. Lizarribar's questioning on whether there had been any attempts to "cover-up" the conspiracy, Garcia described the Florida Festival meeting to the jurors in the following manner:

Q. Do you know if at any time the three named defendants met at any point to cover up or to try to explain the purpose of the payments of $220,000?

A. Yes. Last year around the first part of September, just prior to the time that Miguel Serrano obtained local immunity from the prosecution, they met in Orlando, Florida, at the Florida Festival.

Q. When you say "they", to whom are you referring?

A. When I say "they", Jose Tormos Vega, Juan Luis Boscio and Miguel Serrano. At this point in time, based on the statements that are made, they discussed the problem with the Shearson investigation that was going on. Mr. Tormos at that time indicated he had obtained a loan. Mr. Boscio again reflected that he didn't know any agreements that were between Serrano and the mayor. On the other hand, Mr. Serrano testified that at that meeting they were trying to cover up the payments as an alleged loan, that that was a cover-up on the part of the mayor and Attorney Juan Boscio.

Grand jury transcripts, October 31, 1985, p. 14, lines 10–25, p. 15, lines 1–2.

The case agent mentioned to the jurors that the purpose of the conspiracy was to assure that Serrano kept the Ponce Municipality account with Shearson-American Express and that this was what Serrano had testified "before the local Senate". *Id.* pp. 11–12. Garcia also considered it important to bring to the grand jury's attention the specific amounts that were allegedly distributed between the conspirators. According to Garcia's summary, Tormos and Boscio each received $110,000 from the $660,-000 extra commission.[18]

18. The grand jury transcript of October 31, 1985 reflects a typographical error in the pertinent amounts described in the indictment.

The grand jury issued a three count indictment on that same day, October 31, 1985, charging Serrano in one count only, that of the conspiracy. The indictment describes the extortion conspiracy as an agreement between the three defendants to collect a $660,000 payment from the Ponce Municipal Development Authority account at Shearson-American Express and the subsequent payment of kickbacks of $110,000 each to former Ponce Mayor Tormos and former Ponce Assemblyman Boscio. According to the indictment, the kickback payments to these two officials would ensure that Serrano would retain the Ponce Municipal Development Authority at Shearson-American Express. It is charged that the first of these payments was in the form of 120 money orders in the amount of $1,000 each and was split between Boscio and Tormos in the sums of $10,000 and $110,000, respectively. The second and last payment was in the form of 100 money orders of $1,000 each allegedly received by Boscio. With this factual framework in mind we proceed to examine the applicable law.

■ As indicated in *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), "The power of government to compel persons to testify in Court or before grand juries and other governmental agencies is firmly established in Anglo-American jurisprudence". *id.* at p. 443, 92 S.Ct. at 1655. This power, however, is not absolute. The Fifth Amendment privilege, which "protects against any disclosure which the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used", (footnote omitted) *id.* at p. 445, 92 S.Ct. at 1656, is its most important exemption. Courts have been zealous in safeguarding the values underlying this privilege, *id.* at pp. 445–46, 92 S.Ct. at 1656–57, *see also In re Kave*, 760 F.2d 343, 353–56 (1st Cir.1985). Immunity statutes are not incompatible with such values. They seek an accommodation between these two legitimate principles, *Kastigar* at 446, 92 S.Ct. at 1657. The immunity granted must be coextensive with the privilege. If it is not as comprehensive as the protection afforded by the Fifth Amendment, then it cannot withstand constitutional

scrutiny, *id.* at 453, 92 S.Ct. at 1661. The immunity afforded must "leave the witness and the prosecutorial authorities in substantially the same position as if the witness had claimed the Fifth Amendment privilege" *id.* at p. 462, 92 S.Ct. at 1666. Although in *Kastigar* the Court was examining these constitutional provisions in the context of whether the federal immunity statute, 18 U.S.C. Sec. 6002, afforded the necessary Fifth Amendment protection from federal prosecution, in *Murphy v. Waterfront Com'n. of New York Harbor*, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964), the Court had already held that the Fifth Amendment protected witnesses afforded immunity under state law from federal prosecution based on their immunized testimony. The essential safeguards required to insure that the immunity afforded, whether by state or federal authorities, would coexist with the constitutional privilege mentioned in the *Murphy* setting were reiterated by *Kastigar* in the federal context.

The constitutional standards laid out by the Court in *Kastigar*, although not an absolute bar to prosecution of a witness who has testified under a grant of immunity, did establish some very strict parameters against "the use of compelled testimony, as well as evidence derived directly and indirectly therefrom", *Kastigar* 406 U.S. at 453, 92 S.Ct. at 1661. The Court warned that the immunity prohibits "prosecutorial authorities from using the compelled testimony in *any* respect ..." *id.* Citing from what the Court considered to be the still valid conceptual holding of *Counselman v. Hitchcock*, 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110 (1892), it mentioned that an immunity statute would be deficient if it could not prevent the use of a witness' compelled testimony to "search out other testimony" that could be used as evidence against the witness or if the immunized testimony could be used to gain "knowledge of the details of a crime and of sources of information which may supply other means of convicting the witness or party". *id.* 406 U.S. at 454, 92 S.Ct. at 1661. In response to the petitioners' argument that the use and derivative use immu-

nity standard of Section 6002 would not protect a witness adequately in view of the subtle ways such testimony may be used by prosecutors, the Court stated:

> This argument presupposes that the statute's prohibition will prove impossible to enforce. The statute provides a sweeping proscription of any use, direct or indirect, of the compelled testimony and any information derived therefrom:
>
> \*     \*     \*     \*     \*     \*
>
> This total prohibition on use provides a comprehensive safeguard, barring the use of compelled testimony as an *"investigatory lead,* and also barring the use of any evidence obtained by focusing investigation on a witness as a result of his compelled disclosures.

*id.* at 459–60, 92 S.Ct. at 1664–65. (footnote omitted, emphasis supplied). Re-emphasizing that, as established by *Murphy v. Waterfront,* the government has the burden of showing that their evidence is not tainted by the facts provided by the compelled testimony, the Court held that, once a defendant shows that he testified under a grant of immunity, a "heavy burden" shifts to the government who must not merely negate any taint but affirmatively prove that the evidence it used is derived from a legitimate source wholly independent of the compelled testimony. *Kastigar id.* at p. 460, 92 S.Ct. at 1665.

Following *Murphy* and *Kastigar's* strictures, other courts have considered various direct and indirect uses of immunized testimony as violative of a Fifth Amendment rights. In *United States v. McDaniel,* 449 F.2d 832 (8th Cir.1972), the Court found that a prosecutor's mere reading of a transcript of a defendant's testimony under immunity violated the defendant's Fifth Amendment rights, *see also United States v. Dornau,* 359 F.Supp. 684 (SDNY 1973) (prosecutor's reading of immunized transcript to make sure case was complete or to buttress what he already knew of case or fill in gaps with new information violated the Fifth Amendment); *but see United States v. Byrd,* 765 F.2d 1524 (11th Cir. 1985) (Reading by agent of immunized testimony transcript insufficient, *per se,* to establish taint). In *United States v. Kurzer,* 534 F.2d 511 (2d Cir.1976) the Court

stated that if a witness's decision to testify against a defendant is based on the information provided by that defendant under a grant of immunity, then the adverse witnesses's testimony can be considered as a derived use of immunized testimony; *but see United States v. Romano,* 583 F.2d 1 (1st Cir.1978) (declining to decide to what extent they accepted the Second Circuit's view of the importance of a witness's motivation to testify adversely, but finding no "whipsawing" or use by the prosecutor of the immunized testimony as a leverage to obtain the testimony of other witnesses). The analysis will inevitably turn on whether the facts marshalled by the government in discharging its heavy burden show legitimate, independent sources for its evidence. *Romano* 583 F.2d at 7. Nevertheless, there may be situations where the government may have been so involved with the evidence obtained under a grant of immunity that it will be practically impossible to discharge its burden of proving independent sources. In *United States v. McDaniel* 482 F.2d 305, 311 (8th Cir.1973) the Court found that the prosecutor's reading of defendant's immunized testimony without knowing at the time that the testimony was given pursuant to a grant of immunity and the prosecutor's ensuing failure to perceive any reason to segregate the testimony and not use it as "assistance in focusing the investigation, deciding to initiate prosecution, refusing to plea bargain, interpreting evidence, planning cross examination, and otherwise generally planning trial strategy", made the government's burden of showing independent sources for its evidence an "insurmountable task". *id.*

In order to prevent the government's task from becoming "insurmountable", the Department of Justice provides a detailed set of guidelines for its attorneys to follow whenever a defendant, or a potential one, will testify under a grant of immunity to matters related to a pending criminal investigation or to a case that is being prosecuted. As indicated in the United States Attorney's Manual of March 23, 1984, Title 1 Chapter 11.330, in order to avoid jeopardizing prosecutions of defendants or poten-

tial defendants when these will testify under a grant of immunity,

"the attorney for the government shall:
1. before the witness has testified or provided other information, prepare for the case file a signed and dated memorandum summarizing the evidence then known to exist concerning the witness, and designating its sources and date of receipt;
2. ensure that all testimony given, or information provided, by the witness be recorded verbatim and that the recording or reporter's notes, together with any transcript thereof, be maintained in a secure location and that access thereto be documented and;
3. maintain a record of the nature, source and date of receipt of evidence concerning the witness' past criminal conduct that becomes available after he/she has testified or provided other information; or

. . . .

The Manual indicates that these provisions are to be followed "when, on the basis of the information available at the time the testimony is to be given or the information is to be provided, it is anticipated that a future prosecution of the witness, for any prior offense about which the witness is to be questioned, may be in the public interest. In the event of future prosecution (except a perjury, false statement, or contempt prosecution based on the compelling of the testimony), the government must be in a position to demonstrate convincingly that its evidence was developed independently of the witness's compelled testimony or of information derived therefrom. The government will also have to show that it has made no "nonevidentiary" use of the testimony or its fruits, such as a decision to focus on the witness as a potential defendant. For these reasons, it is essential that a record be maintained of all untainted evidence against a witness who is compelled to testify, that his/her compelled testimony be maintained in a secure place, and that access to such testimony be documented. *Unless these steps are taken, it may prove impossible to establish the purity of the govern-*

*ment's case in a future prosecution of the witness.* (emphasis supplied). The Manual also mentions that as a matter of Departmental policy, "in cases where the witness is to be charged with an offense either first disclosed in or closely related to his/her compelled testimony, prosecution shall not be initiated unless the Attorney General personally authorized the prosecution."

It is undisputed that defendant Serrano testified on matters related to the particulars set forth in the indictment under a grant of immunity by the House of Representatives of the Commonwealth of Puerto Rico. It was, therefore, incumbent upon the government to discharge its burden of proving by preponderance that the evidence presented to the indicting grand jury was derived from a source wholly independent from his immunized testimony. In this context, it is significant to note that neither case agent Garcia nor the Assistant U.S. Attorney in charge of prosecuting the case knew of the existence of the Attorney General's guidelines which establish the necessary procedures to avoid jeopardizing prosecution of defendants who have testified under grants of immunity on matters related to the crimes prosecuted. A.U.S.A. Lizarribar testified that, after defendant Serrano brought up the matter of the Guidelines, she requested them from the Department of Justice. Transcript August 18, 1986, p. 82. The government did not present any evidence on whether any of these guidelines were followed at any stage and the obvious conclusion, given Garcia's and the prosecutor's ignorance of their existence, was that they were not. In fact, we have serious doubts whether, not only agent Garcia, who is not an attorney and who did not know if he was briefed on the principles established by *Murphy* and *Kastigar* during his initial FBI training at Quantico, but also the U.S. Attorney for this District, Daniel Francis Lopez Romo, were really aware of the constitutional ramifications of the situation they were facing before and after Serrano testified under immunity. The answers given by U.S. Attorney Lopez Romo, when questioned by defense counsel during the hear-

ing before the Magistrate evidence a limited understanding of the *Murphy-Kastigar* principles. For example, the U.S. Attorney did not "see anything wrong" in Serrano's immunized testimony going before the grand jury and also considered that "even if it is immunized testimony, the testimony can be used to impeach the defendant's testimony" [19], p. 97, uses which are clearly proscribed by *Kastigar's* absolute bar to use of compelled testimony in "any respect" *id.* 406 U.S. at 453, 92 S.Ct. at 1661. It is perhaps due to this ignorance of the relevant constitutional safeguards that government involvement with Serrano's immunized testimony, as shown by the agent's deliberate exposure to it, was so pervasive. From the moment Garcia learned that Serrano was going to testify in televised hearings before the Puerto Rican Legislature, he took it upon himself to become saturated with its contents. This he achieved by watching the testimony live on television, videotaping it, watching those tapes three or four times despite their more than twelve hour duration and his admitted time restrictions due to a heavy workload, and obtaining two separate sets of transcripts of the videotaped immunized testimony. Agent Garcia felt justified in going to these extremes regarding the immunized testimony of a potential defendant who was the principal suspect in his investigation because the hearings were public and televised, and, as repeatedly stated, he used it only to corroborate what he already had. This, coming from an agent who at that time still had "thousands and thousands" of documents that he needed to review, and who only had "a general idea of the case", strains credibility. Garcia's own testimony reflects a superficial exposure and a weak grasp of the investigative

materials in his own file prior to Serrano testifying under immunity. Although it appears that the FBI investigation had amassed a significant amount of raw data which inculpated Serrano prior to his appearance before the Legislature, it is, however, clear from the record before us that the agent assigned to the case, informed of the impending immunized testimony but ignorant of the safeguards, his actions unsupervised as to this potential constitutional danger, jumped at the opportunity using the immunized testimony as a means of advancing, organizing and gaining insight into voluminous materials, mostly unread documents, in his files related to complex financial transactions.

■ The government's contention that Serrano's immunized testimony added nothing new to the investigation is also defeated by the record. We cannot but infer that a case agent, such as Garcia, who deliberately seeks, has continuous access to, and immerses himself in the protected testimony at a point in his investigation when he has only a general idea of the case, must have done this aware of its value and must have persisted in his efforts because he was obtaining investigative leads and advancing his investigation. Notwithstanding agent Garcia's evasive responses and backtracking during the hearings on the dismissal motion, assuring the Court that the testimony neither helped nor brought new things to his investigation, his own expressions before the Magistrate and before the grand jury itself reflect otherwise. He admitted before the Magistrate "that the main thing that came out of those tapes were the alleged kickbacks that were paid to ex-Mayor Tormos and Juan Luis Boscio", transcript August 18, 1986, p. 59; and

---

19. The complete questions and answer were transcribed as follows:

Q. As the U.S. Attorney and as the expert in this area of the Waterfront Commission case, as Exhibit D and which were Serrano's testimony before the Legislature actually had been introduced in this criminal trial, would that have been a violation of Murphy?

A. It all depends on the situation. If it would have been presented, that evidence would not have been obtained through any other means other than immunized testimony, I am sure that the defense would have objected to it. I understand even if it is immunized testimony, the testimony can be used to impeach the defendant's testimony. We have to go on a case by case basis if when in fact it had been presented.

Q. Would you have had no objection to it being included as an exhibit in either of the two cases?

A. As long as we were complying with the law. It has to be on a case by case basis and I don't know the particular circumstances. I don't know.

that "the only thing that came out when he testified was the distribution of the $660,000" *id.* at p. 70. Although agent Garcia claimed that he had this information in his files prior to Serrano's testimony, referring specifically to Francisco Pujol's statement that the $660,000 had been split evenly between the three defendants and to the money orders with fictitious names cashed by Tormos and the 100 money orders received by Boscio, the truth is that prior to Serrano's testimony the government did not have any information on the details of the distribution or the exact quantities involved. The explicit manner in which the distribution of the alleged kickbacks was described in the indictment was first revealed by Serrano's version of the facts during the immunized testimony. Before that, the amounts shown by the money orders clearly did not square with Pujols' theory of $440,000 in kickbacks to Tormos and Boscio because the money orders only added up to $220,000. The government's opposition of December 5, 1986, p. 7, docket entry 228, which points to Jaime Dávila as the source who informed that Boscio retained $10,000 in money orders from the initial $120,000 and hand delivered the remaining $110,000 to Tormos, is not supported by Dávila's 302 reports of May 11, 1984 and April 15, 1984. There is no mention in these reports that Dávila knew that Boscio retained $10,000 from the $120,000 and delivered the rest to Tormos. All that these 302's state is that Boscio was given the $120,000 in money orders and delivered them to Serrano. Likewise, Timothy Petersen's 302 report of August 22, 1984 only indicates that Serrano had waved a $660,000 check before him indicating it was bribe money earmarked for the Mayor of Ponce and Boscio. It is only after Serrano testifies, that Petersen corrects his version as to the amount of the check waved, from $660,000 to $120,000, which, nonetheless, still does not reveal the exact bribe amount of $110,000. It is only through Serrano's testimony that the government is able to ascertain the significance of the money orders, for it is Serrano who explains that out of an initial payment of $120,000 in money orders, $10,000 were retained by Boscio and $110,000 went to Tormos, and that a later payment of $100,000, also in money

orders, was made to Boscio. This information filled in a significant gap in the government's investigation since it tied in one key piece of evidence to another, something that was crucial to the conspiracy charge. In addition, Serrano's testimony also revealed to the case agent the purpose of the kickbacks-to retain the Shearson-American Express account with the municipality—and the conspirators attempt, shortly before the hearings, to cover up the conspiracy. These new items of evidence helped the case agent in gleaning the contours of a criminal conspiracy from the voluminous data he had yet to review. Based on the above, we cannot give serious consideration to the government's contention that its agent did not use the important information revealed by Serrano's testimony in the manner prohibited by *Kastigar*.

It is also highly probable that evidence obtained after Serrano's testimony, namely, the Boscio and Tormos' testimonies, resulted from an indirect use of the immunized testimony. Although we agree with the government that Boscio and Tormos were already targets of the investigation before Serrano testified under the grant of immunity and that the Magistrate made conflicting findings as to this matter in his Report and Recommendation, the fact remains that neither Tormos nor Boscio had been interviewed or even approached before Serrano testified. Exactly six days after Serrano's testimony concluded, Tormos was interviewed by FBI agents in Florida upon agent Garcia's request. As the record shows, Garcia admitted (for reasons which the prosecutor candidly conceded at oral argument she could not explain) that Tormos was contacted to see if he was willing to speak about the allegations of kickbacks made by Serrano during his immunized testimony. Despite Garcia's attempt to sanitize these admissions by subsequently indicating that he had other sources (Pujol-money orders) for the kickbacks, the reference to the amount of $110,000 in the 302 report of the Tormos interview in Florida clearly shows that Tormos was being confronted with the specific allegations made by Serrano during his im-

munized testimony. This confrontation unleashed a reaction in Tormos and Boscio, each advancing their own conficting explanation. Boscio's explanation impeached the one previously given by Tormos to the FBI and, in the process, directly implicated Serrano in the conspiratorial scheme. These conflicting versions were the essence of the testimonies given by them and read before the indicting grand jury. Regardless of Tormos' motivation [20] for providing the statements to the FBI, something which, to the government's disadvantage, is impossible to ascertain from the record, we can conclude that agent Garcia made a brazen and successful attempt to obtain from Boscio and Tormos evidence incriminating Serrano through the use, as leverage, of Serrano's immunized testimony describing in detail Tormos and Boscio's involvement with the kickbacks.

Agent Garcia not only utilized Serrano's immunized testimony to focus his investigation and to obtain important data about the conspiracy, but he went a step further and brought it into the grand jury room. The government tries to dismiss this violation of Serrano's constitutional rights by stating in its opposition of December 5, 1986, at p. 21, that it wasn't until the very end of Garcia's testimony before the grand jury on October 31, 1985 that he referred to facts testified to by Serrano and that "no other mention had been made of Serrano's immunized testimony to the grand jury". This single breach, it is argued, was cured by the prosecutor's admonition to the grand jurors to disregard it. A reading of the grand jury transcript of October 31, 1985 reveals that this is not a correct representation. We must first note that Garcia made reference at least thrice to the fact that Serrano had testified under a grant of local immunity. These references were unnecessary for Garcia's presentation of the case. They reveal a desire to call the ju-

rors' attention to the existence of that fact and an attempt to influence their perception of Serrano's criminal involvement. In addition to commenting the fact that Serrano had testified under immunity, the agent also made mention of the specific contents of Serrano's testimony. This did not happen only at the end of his presentation, as claimed by the government. Garcia told the grand jurors point-blank that Serrano testified before the local Senate indicating that the $220,000 payment to Tormos and Boscio would assure that he kept the Ponce Municipality account at Shearson-American Express. Even though the prosecutor tried to steer agent Garcia away from his own comments by pointing out the Pujol source for that information, the truth of the matter is that the Pujol statements did not address the purpose of the conspiracy. Furthermore, Serrano's testimony was again used by the agent and presented to the grand jury when Garcia mentioned to the jurors the specific amounts that were distributed between Boscio and Tormos as kickback payments, which, as we indicated, were discovered by the agent through Serrano's immunized testimony.

The government's most serious violation of Serrano's Fifth Amendment rights, however, occurred when the agent mentioned before the grand jury the alleged cover-up meeting at the Florida Festival shopping mall. Agent Garcia has admitted, and the government concedes, that he first learned of this information from Serrano's immunized testimony. It is important to note that, despite the prosecutor's characterization of this as a minor slip by the agent which she immediately arrested through cautionary instructions, it was through the prosecutor's own questions that this matter was brought up and revealed to the jurors. Her admonition that the jurors not rely on Serrano's immunized testimony could have

**20.** The government's argument that the Magistrate's findings made in his Report and Recommendation of September 30, 1986 denying Tormo's motion to suppress his testimony to the grand jury, on the voluntariness of Tormos' statements contradict his later findings that Tormos was subdued lacks merit. The Magistrate's references to Tormos' motivation in the report and recommendation of November 21, 1986

were made in the context of the analysis conducted to examine Serrano's argument that his immunized testimony was indirectly used as a leverage to prompt Tormos into testifying. This does not mean that the later statements made by Tormos were made under duress and coercion, as those terms are understood within the context of a suppression analysis.

**1536**

little or no effect considering that the prosecutor's question and the agent's answer immediately before the warning were aimed at establishing that the government had independent sources, consisting of the testimonies of Boscio and Tormos, for the Florida Festival information the agent had just revealed. The agent misled the jurors by identifying these two additional sources for the cover-up meeting when he admittedly knew that the real and the only source which established that this was a meeting to *cover up* the conspiracy came from Serrano's immunized testimony. Also, by pointing to an alleged independent source for the cover up evidence, the prosecutor's admonition was rendered meaningless in the jurors' minds for there was no reason for them to discard this piece of information that had been validated by agent Garcia's answer as derived from a non-immunized source.

The importance of this information has been distractingly understated by the government's specious argument that this meeting was not part of the conspiracy charged. Although the Magistrate erroneously concluded that the conspiracy described in the indictment was "hatched" at the Florida Festival meeting and, even though there is no mention of that meeting in the indictment, the grand jury transcript clearly shows that the coverup meeting information was *used* by the prosecution as evidence to indict. The issue is not whether the Florida Festival meeting is an integral part of the indictment or whether the testimonies of Boscio and Tormos read to the Grand Jury referred to that meeting. The Tormos and Boscio references to this meeting clearly did not describe it as a cover-up of the criminal conspiracy charged, as did Serrano in his immunized testimony. If anything, they were intended as exculpatory references which the government impeached before the grand jurors by using Serrano's incriminating explanation of the meeting. By discrediting the exculpatory versions given by co-conspirators Tormos and Boscio through the direct use of immunized testimony references to the meeting as a cover up of the crime charged, the government invigorated the entire presentation of its conspiracy case before the jurors. How was this done? The government's version of the conspiratorial participation of Tormos and Boscio became more credible and, through the agency theory of conspiracy which establishes that one conspirator is responsible for the acts and statements of every other member of the conspiracy, the conspiracy count against Serrano was strengthened. This information of a cover-up was used as evidence to delineate to the jurors the elements of the conspiracy. It also served as proof of consciousness of guilt. It cannot seriously be argued that its use did not influence the jurors against Serrano. That evidence was highly probative of guilt for the act of covering up would indicate to the jurors that Boscio, Tormos and Serrano, partners in crime, met to conceal the conspiracy charged so as not to be detected and apprehended.

Given the government's heavy burden and the number of ways in which it used the immunized testimony to indict Serrano, it is in an extremely weak position to argue that the indictment should be dismissed. The case it cited, *United States v. First Western of Minot, N.D.*, 491 F.2d 780, (8th Cir.1984) is distinguishable. The decision in that case was based on the clear premise of a showing of non use of the immunized testimony either by lack of access to the immunized testimony or a direct statement made in good faith that the prosecuting sovereign did not use the immunized testimony. *id.* at 783. In the present case, access, exposure and use to the immunized testimony were pervasive. Neither can the evidence derived from the immunized testimony. That notion has been rejected by a number of circuit courts which have ruled that, when evidence derived from an government save the indictment against Serrano by advancing the theory that the proper remedy is not dismissal but suppression during trial of any evidence derived from the immunized testimony. That notion has been rejected by a number of circuit courts which have ruled that, when evidence derived from an immunized testimony is used to obtain an indictment against the immunized witness, the proper remedy lies in dismissal of the indictment.

*United States v. Kurzer,* 534 F.2d 511, 516 (2d Cir.1976). *See e.g. United States v. Beery,* 678 F.2d 856, 862 (10th Cir.1982).

More closely analoguous to our case is the situation present in *United States v. Hampton,* 775 F.2d 1479 (11th Cir.1985). There, as here, there was a "breadth of exposure" to immunized information, "lack of contemporaneous knowledge of the *Kastigar* problem, (and) absence of contemporaneous precautions against intentional or unintentional use of immunized materials in furtherance of the federal investigation." *id.* at 1491 N. 53. There, as here, the government lent itself to the impossible task of "legitimating all of the government's evidence after the fact" *id,* a task which failed to meet the required burden by a very wide margin.

It is not within our province to question whether the resolution of the House of Representatives of Puerto Rico granting immunity to Serrano was a political ploy, as has been suggested. What is clearly within our realm is the duty to ensure that the Constitution is meaningful and that it endures. Were we to remain impassive to the government's trampling of Serrano's rights, due to a great extent to its own ignorance of the applicable constitutional standards, we would be failing in our duty.

For the reasons stated, Magistrate Castellano's Report and Recommendation, filed on November 21, 1986, is hereby APPROVED; the motions to dismiss the indictment filed by defendant Miguel A. Serrano on January 3, 1986 and in April 11, 1986 are hereby GRANTED and the indictment filed against defendant Miguel A. Serrano in this case is hereby ordered DISMISSED.

SO ORDERED.